**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

CENTER FOR BIOLOGICAL DIVERSITY,
  378 N. Main Avenue
  Tucson, AZ 85701,

        and

STUART PIMM,
  1 Bland Spring Place
  Durham, NC 27713,

              *Plaintiffs*,

        v.

DEBRA HAALAND, in her official capacity
  as Secretary of U.S. Department of Interior,
  1849 C Street, NW
  Washington, DC 20240,

MARTHA WILLIAMS, in her official capacity
  as Director of U.S. Fish and Wildlife Service,
  1849 C Street, NW
  Washington, DC 20240,

        and

U.S. FISH AND WILDLIFE SERVICE,
  1849 C Street, NW
  Washington, DC 20240,

              *Defendants*.

Case No: 1:24-cv-00990

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Human-caused climate change poses existential threats to many species listed as endangered or threatened under the Endangered Species Act. 16 U.S.C. §§ 1531–44 ("ESA"). The ESA requires all federal agencies, in consultation with the U.S. Fish and Wildlife Service ("Service"), to insure their actions do not jeopardize the continued existence of or destroy the "critical habitat" of listed species. *Id.* § 1536(a)(2). Yet under longstanding policy—embodied in a 2008 Solicitor for the Department of the Interior's memorandum opinion ("M-Opinion")—the Service refuses to evaluate whether greenhouse gas ("GHG") emissions from federal agency actions are injuring (or even jeopardizing) species.

2.      Plaintiffs Center for Biological Diversity ("Center") and Dr. Stuart Pimm challenge the failures of Defendants the U.S. Fish and Wildlife Service, its Director, and the U.S. Secretary of the Interior (collectively the "Service") to adequately protect and mitigate the risk of offshore oil and gas activities in the Gulf of Mexico in violation of the ESA and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501–706.

3.      This case concerns the Service's inadequate 2018 Biological Opinion on the effects of extensive Gulf of Mexico offshore oil and gas activities ("Biological Opinion")—causing billions of tons of greenhouse gas pollution—on threatened and endangered sea turtles, birds, manatees, and other imperiled animals. The Biological Opinion follows the guidance in the M-Opinion and omits any analysis of the climate harms from offshore drilling. This case also challenges the Service's failure to respond to a Center petition requesting rescission of that outdated nationwide policy of ignoring climate harms when implementing the ESA.

4.      The Biological Opinion purports to examine federal oil and gas leasing, exploration, development, production, decommissioning, and all related activities in the Gulf of Mexico for a ten-year period, with an activity lifespan of another 40 years.

5.      A massive amount of federally authorized oil and gas activities occurs in the Gulf of Mexico, including over 2,240 active oil and gas leases across nearly 12 million acres. These active leases include thousands of platforms and rigs; tens of thousands of miles of pipeline; and tens of thousands of oil and gas wells. According to federal estimates, each new oil and gas lease sale results in up to roughly 1,750 new wells, 280 new production structures, and 1,330 miles of new pipelines.

6.      The federal oil and gas activities analyzed in the Biological Opinion comprise one of the nation's largest sources of greenhouse gas emissions. Between now and 2030, the Department of the Interior predicts that roughly 2 million barrels of oil per day—or 700 million barrels per year—will be extracted from the Gulf of Mexico, emitting over 320 million tons of greenhouse gases per year. Because operations approved today have an average 40-year lifespan, extraction of billions more barrels of oil beyond 2030 is highly likely.

7.      The Biological Opinion's silence on greenhouse gas pollution is unlawful. The Opinion fails to quantify greenhouse gas emissions, ignores climate change as part of the environmental baseline, and, most importantly, omits analysis of the impacts of greenhouse gas pollution on threatened and endangered species and their critical habitat. On information and belief, these failures stem from the 2008 M-Opinion that concludes greenhouse gases can never be considered an "effect" of an agency action, no matter how great the emissions are from such action. Accordingly, the Service has never consulted on the greenhouse gas emissions from offshore drilling in the Gulf of Mexico, nor for any other federal actions.

8.      In addition to ignoring the effects of climate change, the Biological Opinion also fails to properly analyze and minimize other harms to threatened and endangered species, including sea turtles, seabirds, beach mice, fish, and marine mammals. Specifically, the Biological Opinion fails to adequately address the threats of oil spills; collisions with vessels and offshore platforms; light pollution; and the degradation and destruction of habitat for the Gulf's threatened and endangered species.

9.      The Biological Opinion arbitrarily concludes, in contravention of the best available science, that during the 50-year period of activity, not even a single whooping crane, Mississippi sandhill crane, piping plover, red knot, beach mouse, Cape Sable seaside sparrow, or West Indian manatee will be harmed at all. For loggerhead and Kemp's ridley sea turtles, the Biological Opinion does not analyze impacts except by stating that harm to them would be "extremely low, but not zero."

10.      To reach these conclusions, the Biological Opinion omits from all analysis the possibility of a catastrophic oil spill above one million barrels. The Opinion does so by deferring to the assertion of *other* agencies (including the Bureau of Ocean Energy Management) that a catastrophic spill "is not reasonably certain to occur and, therefore, is neither a direct nor an indirect effect of the proposed action." However, these same agencies (and/or their functional predecessors) similarly predicted that there was a low risk of a catastrophic oil spill in the Gulf of Mexico before the disastrous Deepwater Horizon spill that wreaked widespread ecological havoc, including on many of the same listed species addressed in the Biological Opinion. As for a very large spill—greater than 10,000 barrels in size—the Biological Opinion concedes that "up to one spill of this size is likely to occur over the 40-year period analyzed," and it yet arbitrarily concludes that it is unlikely any listed species or designated critical habitat would be harmed by

an oil spill. The Biological Opinion otherwise fails to properly assess the environmental baseline, account for cumulative impacts, or address the recovery of listed species. It also improperly constrains the geographic action area to ignore the impacts of an oil spill within the Gulf of Mexico to places such as the Florida Keys; ignores the best available science; relies on uncertain mitigation measures; and lacks an incidental take statement for harm to listed species that is reasonably certain to occur.

11.     Accordingly, given the numerous legal deficiencies of the 2018 Biological Opinion, Plaintiffs request that the Court find the 2018 Biological Opinion is arbitrary and capricious, including because it ignores—consistent with the 2008 M-Opinion—the impact of oil and gas activities on climate change, and that the Court vacate the Biological Opinion. The Center also seeks an order requiring Defendants to respond to the Center's petition requesting that the Service amend ESA regulations to specify that greenhouse gas emissions must be considered during ESA consultation.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this matter under 28 U.S.C. § 1331, because this case presents a federal question under the laws of the United States, including the ESA and APA; under 28 U.S.C. § 1346 (action against the United States); and under 28 U.S.C. § 1361 (action to compel an officer of the United States to perform his or her duty). An actual, justiciable controversy now exists between Plaintiffs and Defendants, and the requested relief is proper under 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

13.     Venue in this Court is proper under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District and Defendants reside in this District.

## PARTIES

### I.   Plaintiffs

14.    Plaintiff Center for Biological Diversity is a national conservation organization that advocates for the protection of threatened and endangered species and their habitats through science, law, and policy. The Center's mission also includes protecting air quality, water quality, and public health. The Center has over 79,000 members worldwide. The Center brings this action on behalf of itself and its members.

15.    The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, sea turtles, and seabirds are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Gulf of Mexico from offshore oil and gas drilling activity.

16.    The Center's members live near and regularly visit the Gulf of Mexico and its beaches and waters near offshore platforms for vocational and recreational activities such as swimming, kite surfing, fishing, and viewing and studying wildlife, including ESA-protected species like sea turtles, manatees, beach mice, whooping cranes, sandhill cranes, and piping plovers. The Center's members derive recreational, spiritual, professional, scientific, educational, and aesthetic benefits from their activities in these areas. The Center's members intend to continue to use and enjoy these areas frequently and on an ongoing basis in the future. The Center's members also enjoy species that are found in the Gulf of Mexico on their migrations elsewhere in the country.

17.    Offshore oil and gas drilling activities in the Gulf, as authorized by the Biological Opinion, degrade these habitats and threaten wildlife and the environment. For example, offshore

drilling activities increase air pollution that is harmful to public health. They discharge

wastewater that contaminates the ocean with toxic pollutants. And they require shipments to

offshore platforms, thereby increasing vessel traffic, which in turn increases ocean noise and

increases the risk of vessel strikes of manatees and other marine life.

18.     Offshore oil and gas activities, as authorized by the Biological Opinion, cause oil

spills. Oil spills have a wide array of lethal and sublethal impacts on wildlife, both immediate

and long term. Oil destroys the waterproofing and insulating properties of feathers and fur of

birds and mammals, respectively, compromising their buoyancy and ability to thermoregulate.

Oil can also harm wildlife through reduction of key prey species.

19.     Offshore oil and gas drilling, as authorized by the Biological Opinion, injures the

Center's members' recreational, spiritual, scientific, cultural, and aesthetic enjoyment of the Gulf

of Mexico, its beaches, and other waters and coastal areas where offshore drilling occurs. It

harms water quality and wildlife that they study and observe and decreases their ability to enjoy

species that are impacted by offshore drilling activities.

20.     For example, one Center member lives on the southern Texas coast and regularly

uses the Gulf of Mexico to go swimming, take walks along the beach, and observe and look for

Kemp's ridley sea turtles, green sea turtles, and loggerhead sea turtles, whooping cranes, and

other wildlife. He goes to beaches where Kemp's ridley and other sea turtles nest and participates

in efforts to protect them and rehabilitate and release injured sea turtles back into the wild.

Another Center member lives in Florida and travels throughout the state in the hopes of seeing

wildlife, including manatees, and regularly photographs manatees while diving in their habitat.

Another Center member is an avid bird watcher and has traveled to Texas, Louisiana, and Florida

to see coastal and ocean birds, including whooping crane, eastern black rail, and black-capped petrel. These members intend to regularly engage in these activities for the foreseeable future.

21.     The Service's Biological Opinion harms the interests of these and other Center members. The Service's failure to properly review the impacts of Gulf of Mexico oil and gas drilling means Defendants are failing to abide by the ESA's procedural obligations that are designed to avoid, minimize, and mitigate harms to sea turtles, manatees, cranes, plovers, and other threatened and endangered species in which the Center's members have concrete interests. In turn, the Biological Opinion fails to adequately protect the Gulf's already-imperiled wildlife, thereby exposing them, their critical habitats, and the coastal environment to increased risk of harm. Such risks include, but are not limited to, increased risk of injury and death to manatees from vessel strikes, increased risk of injury and death to birds from collisions with offshore platforms, and increased risk of oil spills, which could have devastating environmental and economic consequences.

22.     The Service's failure to respond to the Center's 2022 rulemaking petition violates the Center's procedural right under the APA to a prompt response and impairs the Center's and its members' interests in ameliorating the many harms to listed species throughout the country caused by climate change. The Service's failure to respond to the petition in a timely manner is impeding the Center's organizational mission to conserve imperiled species and causing the diversion of Center resources that would otherwise be spent on other vital conservation programs. In particular, Defendants' failure has required Center staff to spend considerable time and resources attempting to persuade the Service, in consultations on specific agency actions and activities, to incorporate climate change impacts in their analyses—time and resources that would not have to be expended in the event that Defendants responded to the Center's petition by

requiring consultations address climate change–related impacts. The Service's delay in responding to or acting upon these efforts, in addition to harming the recreational, spiritual, scientific, cultural, and aesthetic enjoyment of the Gulf of Mexico, therefore impedes the Center's species' conservation mission and inflicts concomitant resource harm on the organization.

23.     The above-described aesthetic, recreational, professional, spiritual, and other interests have been, are being, and will continue to be adversely affected and irreparably injured by Defendants' failure to comply with the ESA and APA.

24.     Relief in this case would ensure Defendants analyze the full impacts of continued offshore oil and gas activities and ensure the authorization and management of such practices does not jeopardize any threatened or endangered species or adversely modify their critical habitat or result in harm that has not been adequately minimized. The requested relief would result in additional mitigation and oversight of offshore oil and gas activities that would better protect the ocean and imperiled wildlife and alleviate the injuries of the Center and its members. The requested relief would also require Defendants to respond to the Center's rulemaking petition in a timely manner, thereby alleviating the harms flowing from Defendants' ongoing delay.

25.     Plaintiff Dr. Stuart Pimm is a professor of ecology. He graduated with honors from Oxford University in 1971 and received his Ph.D. in Ecology from New Mexico State University in 1974. He began working on ecology, species conservation, and related issues in 1971 and was named a Pew Scholar in Conservation in 1993. He has been awarded numerous awards for his research, including the Kempe Prize for Distinguished Ecologists in 1994, the Dr. A. H. Heineken Prize for Environmental Sciences in 2006, the Tyler Prize for Environmental

Achievement in 2010, and the International Cosmos Prize in 2019. He has authored more than 350 scientific papers and five books; he is one of the most highly cited environmental scientists.

26.     Dr. Pimm has been a professor of ecology at Duke University for more than forty years. Since 2002, he has been the Doris Duke Professor of Conservation Ecology at the Nicholas School of the Environment and Earth Sciences, Duke University. In this capacity, Dr. Pimm has taught a field biology and conservation course to Duke University students for twelve years. The course, which takes place in Dry Tortugas National Park in the Gulf of Mexico, includes focused observation of and instruction about Sooty Terns and other seabirds found in the area.

27.     For decades, the health of the imperiled species and ecosystems analyzed in the Biological Opinion have been important to Dr. Pimm's professional interests. His ability to teach about these species and habitats relies on their continued existence. For this reason, Dr. Pimm has devoted considerable time and energy to studying and trying to save imperiled species, including the endangered Cape Sable seaside sparrow.

28.     For example, Dr. Pimm has been studying and researching this sparrow species since 1989. He has published more than ten scientific papers discussing the Cape Sable seaside sparrow and its habitat, including "Endangered Cape Sable Seaside Sparrow Survival," in the *Journal of Wildlife Management*; "Why Sparrow Distributions do not Match Model Predictions," in *Animal Conservation*; "Water Levels, Rapid Vegetational Changes, and the Endangered Cape Sable Seaside Sparrow," in *Animal Conservation*; and "The Importance of Dispersal Estimation for Conserving an Endangered Passerine Bird," in *Conservation Letters*.

29.     The Biological Opinion, which fails to adequately protect the Cape Sable seaside sparrow and other endangered and threatened species, undermines Dr. Pimm's professional interests.

## II.     Defendants

30.     Defendant Debra Haaland is the Secretary of the U.S. Department of the Interior ("Interior") and is sued in her official capacity. Secretary Haaland directs all business of the Interior and is the official ultimately responsible under federal law for ensuring its actions comply with all applicable laws and regulations, including the ESA and APA.

31.     Defendant Martha Williams is the Director of the U.S. Fish and Wildlife Service and is sued in her official capacity. Director Williams has responsibility for implementing and fulfilling the agency's duties under the ESA and APA.

32.     Defendant U.S. Fish and Wildlife Service is the federal agency within the Interior with responsibility for administering and implementing the ESA for species including sea turtles (while on land), manatees, birds, and terrestrial mammals.

## LEGAL BACKGROUND

## I.     The Endangered Species Act

33.     Considered "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," the ESA embodies Congress's "plain intent . . . to halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978). The ESA reflects "a conscious decision by Congress to give endangered species priority over the 'primary missions' of federal agencies." *Id*. at 185.

34.     The Secretary of the Interior administers the ESA for terrestrial species and seabirds, as well as manatees and nesting sea turtles. The Secretary of Commerce (through the

National Marine Fisheries Service ("NMFS")) administers the ESA for most marine species, including sea turtles while they are in the water.

35.     The ESA's fundamental purposes are "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

36.     To achieve these objectives, the ESA directs the Secretary of the Interior, through the Service, to determine which species of plants and animals are "threatened" and "endangered" and place them on the list of protected species. 16 U.S.C. § 1533. An "endangered" or "threatened" species is one "in danger of extinction throughout all or a significant portion of its range" or "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," respectively. *Id*. § 1532(6), (20).

37.     Once a species is listed, the ESA provides a variety of procedural and substantive protections not provided by any other law, including the protection of critical habitat, the preparation and implementation of recovery plans, the prohibition against the "taking" of listed species, and the requirement for interagency consultation. 16 U.S.C. §§ 1533(a)(3), (f), 1538, 1536. Each of these protections seeks to ensure not only the species' continued survival, but its ultimate recovery.

38.     Section 9 of the ESA prohibits any person from "tak[ing]" any individual of an endangered species without authorization from the Service or NMFS. 16 U.S.C. § 1538(a)(1)(B), (C); *see also id*. § 1532(13) (defining person). "Take" includes both direct and indirect harm and it need not be purposeful. The ESA broadly defines take to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*.

§ 1532(19). The ESA also makes it unlawful for any person, including federal agencies, to

"cause to be committed" the take of a listed species. *Id*. § 1538(g). By regulation, the Service has

defined "harm" to "include significant habitat modification or degradation where it actually kills

or injures wildlife by significantly impairing essential behavioral patterns, including breeding,

feeding or sheltering." 50 C.F.R. § 17.3 (2018).[1] "Harassment" includes any "intentional or

negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such

an extent as to significantly disrupt normal behavioral patterns which include, but are not limited

to, breeding, feeding, or sheltering." *Id*.

39.     Section 7(a)(2) of the ESA generally prohibits agency actions that jeopardize the

continued existence of listed species or result in the adverse modification or destruction of their

critical habitat. 16 U.S.C. § 1536(a)(2). The term "jeopardize" means "an action that reasonably

would be expected . . . to reduce appreciably the likelihood of both the survival and recovery of a

listed species in the wild by reducing the reproduction, numbers, or distribution of that species."

50 C.F.R. § 402.02.

40.     To comply with these substantive obligations, the ESA requires that "[e]ach

Federal agency shall, in consultation with . . . [the Service], insure that any action authorized,

funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of

any endangered species or threatened species or result in the destruction or adverse modification

of [critical] habitat." 16 U.S.C. § 1536(a)(2). This section 7(a)(2) consultation process has been

described as the "heart of the ESA." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495

(9th Cir. 2011).

---

[1] All ESA regulations cited herein are to the 2018 edition of the Code of Federal Regulations that
was in effect when the Service issued its Biological Opinion.

41.     An agency must consult with the Service whenever it takes any action that "may affect" an ESA-listed species or its critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. 402.14(a). Under the "may affect" standard, "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement." 51 Fed. Reg. 19,926, 19,949 (June 3, 1986).

42.     If the agency taking the action (known as the action agency) concludes the action may affect listed species or their critical habitats, it must initiate formal consultation with the Service. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). If an action agency determines that its action is "not likely to adversely affect" any listed species or critical habitat, the Service must concur in writing. 50 C.F.R. §§ 402.13(c), 402.14(b)(1). A biological opinion is required if any adverse effect to listed species may occur as a direct or indirect result of the proposed action. A valid "not likely to adversely affect" determination occurs when all effects are discountable, insignificant, or beneficial. Beneficial effects are contemporaneous positive effects without any adverse effects to the species. Insignificant effects relate to the size of the impact and should never reach the scale where take occurs. Discountable effects are those extremely unlikely to occur. Based on best judgment, a person would not (1) be able to meaningfully measure, detect, or evaluate insignificant effects; or (2) expect discountable effects to occur.

43.     Formal consultation results in the completion of a biological opinion that describes the expected impact of the agency action on listed species. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14.

44.     The biological opinion must include a summary of the information upon which the opinion is based, an evaluation of "the current status of the listed species," the "effects of the action," and the "cumulative effects." 50 C.F.R. § 402.14(g)(2)–(3).

45.     "Effects of the action" are defined as "all consequences to listed species or critical habitat that are caused by the proposed action" and includes "the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur." 50 C.F.R. § 402.02.

46.     The "environmental baseline" includes "the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process." 50 C.F.R. § 402.02. "Cumulative effects" include "future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area." *Id*.

47.     The "action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

48.     Thus, in issuing a biological opinion, the Service must consider not just the isolated share of responsibility for impacts to the species traceable to the activity that is the subject of the biological opinion, but also the effects of that action when added to all other activities and influences that affect the status of that species.

49.     If the Service concludes that a proposed action will jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat, its biological opinion must outline "reasonable and prudent alternatives" to avoid jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

50.     The Service must include an incidental take statement in a biological opinion if it concludes an agency action is not likely to jeopardize the continued existence of a listed species but is reasonably certain to result in take incidental to the agency action. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7), (i).

51.     Incidental take statements must specify the amount or extent of incidental taking, "reasonable and prudent measures" that the Service considers necessary or appropriate to minimize such impact, and "terms and conditions" with which the action agency must be comply. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). Additionally, when incidental take is projected for a listed marine mammal, the Service must first authorize the take under the Marine Mammal Protect Act, and the incidental take statement must include any additional measures necessary to comply with the Marine Mammal Protect Act take authorization. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). Take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under section 9 of the ESA. 16 U.S.C. § 1536(b)(4), (o)(2); 50 C.F.R. § 402.14(i)(5).

52.     In 2015, the Service issued regulations providing that an incidental take statement is not required for a "framework programmatic action" in situations where incidental take will be addressed in subsequent section 7 consultation. However, for a "mixed programmatic action," an incidental take statement is required at the programmatic level "for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation." 50 C.F.R. § 402.14(i)(6).

53.     The Service and the action agency must utilize the "best scientific and commercial data available" throughout the consultation process. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(d).

## II.     Outer Continental Shelf Lands Act

54.     The Outer Continental Shelf Lands Act ("OCSLA") establishes a framework under which the Department of the Interior may lease areas of the outer continental shelf for the purposes of exploring and developing oil and gas deposits. 43 U.S.C. §§ 1331–1356c. The outer continental shelf generally begins three miles from shore—the outer boundary of state waters—and extends seaward to the limits of federal jurisdiction. *Id.* § 1331(a).

55.     OCSLA requires that oil exploration and production be "subject to environmental safeguards" and balanced "with protection of the human, marine, and coastal environments." 43 U.S.C. §§ 1332(3), 1802(2).

56.     OCSLA establishes four separate stages to developing an offshore oil well: "(1) formulation of a 5-year leasing plan by the Department of the Interior; (2) lease sales; (3) exploration by the lessees; [and] (4) development and production." *Sec'y of the Interior v. California*, 464 U.S. 312, 337 (1984).

57.     At the first stage, Interior issues a leasing plan, setting out a five-year schedule "indicating . . . the size, timing, and location" of proposed lease sales. 43 U.S.C. § 1344(a). At the second stage, Interior solicits bids and issues leases for particular offshore leasing areas. *Id.* § 1337. At the third stage, lessees must submit and obtain the Service's approval of an exploration plan before engaging in any exploratory drilling, *id.* § 1340, and at the fourth stage, lessees must submit and obtain the agency's approval of a development and production plan before engaging in production drilling. *Id.* § 1351.

58.     Under OCSLA's implementing regulations, an oil company must obtain a permit to drill prior to drilling a well. 30 C.F.R. §§ 550.281(a)(1), 250.410. An oil company must also obtain approval in the form of a permit to modify if it "intend[s] to revise [a] drilling plan, change major drilling equipment, or plugback" a well. *Id.* § 250.465(a)(1).

59.     The Secretary has delegated her responsibilities under OCSLA to two bureaus within the Interior (collectively, "the Bureaus"). The Bureau of Ocean Energy Management ("BOEM") is responsible for managing leasing, exploration, development, and production of oil and gas resources on the outer continental shelf. 30 C.F.R. § 550.101. The Bureau of Safety and Environmental Enforcement ("BSEE") is responsible for enacting and enforcing safety and environmental standards under OCSLA, as well as issuing drilling permits and permits to modify. *Id.* § 250.101.

III.    **Administrative Procedure Act**

60.     The APA governs judicial review of federal agency actions. 5 U.S.C. §§ 701–706.

61.     Under the APA, a person may seek judicial review to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

62.     The APA specifies that courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

63.     The statute establishes that "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). It also requires that, "within a reasonable time, each agency shall proceed to conclude a matter presented to it." *Id*. § 555(b).

64.     Further, the agency must give "prompt notice" of any "denial in whole or in part" of a written petition, together with a "brief statement of the grounds for denial." 5 U.S.C. § 555(e).

17

**FACTUAL BACKGROUND**

**I.     The 2008 M-Opinion and the Department of the Interior's Positions on Consideration of Greenhouse Gases in Consultations**

65.     On October 8, 2008, then-Solicitor of the Interior, David Bernhardt, wrote M-Opinion 37017 ("M-Opinion") titled *Guidance on the Applicability of the Endangered Species Act's Consultation Requirements to Proposed Actions Involving the Emission of Greenhouse Gases*. The M-Opinion "conclude[s] that where the effect at issue is climate change in the form of increased temperatures, a proposed [agency] action that will involve the emission of GHG cannot pass the 'may affect' test and is not subject to consultation under the ESA and its implementing regulations." The M-Opinion asserted that science available in 2008 was insufficient to link particular agency actions increasing GHGs to impacts on species, but it did not engage in any independent analysis of the scientific literature in reaching that conclusion. Indeed, the M-Opinion does not cite to any specific scientific literature. Instead, the M-Opinion relies on two internal agency memoranda as the justification for its conclusions: one from the Director of the U.S. Geological Survey titled *The Challenges of Linking Carbon Emissions, Atmospheric Greenhouse Gas Concentrations, Global Warming, and Consequential Impacts* (May 14, 2008) and one from the Director of Fish and Wildlife Service titled *Expectations for Consultations on Actions That Would Emit Greenhouse Gases* (May 14, 2008).

66.     The M-Opinion does not address or reference any other effect of GHG emissions other than increasing temperatures. It does not address "sea level rise" or "ocean acidification," although those were well-known effects of GHGs at the time the M-Opinion was issued.

67.     On information and belief, the Service has relied on the M-Opinion since its issuance in 2008, including in issuing the Biological Opinion, to exclude from its ESA section 7 consultations any analysis of the extent to which federal agency actions will increase GHGs and,

in turn, the degree to which threatened and endangered species will be harmed by those increased emissions along with other cumulative sources of GHGs.

68.     In 2018, the Service together with NMFS proposed changes to the regulations that implement the section 7 consultation process. 83 Fed. Reg. 35,178 (Jul. 25, 2018). In the proposal, public comment was sought as to whether consultations should exempt agency actions that "have effects that are manifested through global processes and (i) cannot be reliably predicted or measured at the scale of a listed species' current range, or (ii) would result at most in an extremely small and insignificant impact on a listed species or critical habitat, or (iii) are such that the potential risk of harm to a listed species or critical habitat is remote." Upon receipt of public comments, the final rule did not adopt this proposal because of "unclear legal authority to adopt such regulations, concern regarding reduced opportunity for cooperation between the Services and Federal agencies, lack of adequate expertise in Federal agencies to correctly make the needed determinations, delays in consultation completion, complication of the consultation process, and failure to examine larger environmental phenomena." 84 Fed. Reg. 44,976, 45,011 (Aug. 27, 2019).

69.     The Service has no explicit policy stating that threats from GHG emissions, such as sea level rise or ocean acidification, cannot be analyzed during a section 7 consultation.

70.     Yet because of the existence of the M-Opinion, federal agencies have taken many actions that may affect—and even jeopardize—the continued existence of threatened and endangered species due to sea level rise or other impacts of GHG emissions without engaging in section 7 consultation regarding such impacts. Accordingly, the M-Opinion continually undermines the implementation of the ESA and frustrates the Service's ability to meaningfully evaluate the full suite of effects of agency actions on listed species.

19

71.     Since 2008, the overwhelming scientific consensus and evidence show that unprecedented climate change is caused by human sources of GHGs. In 2016, the U.S. joined the Paris Agreement committing to reduce greenhouse gas emissions and limit warming to below a 1.5°C. Each year the federal government issues a National Climate Assessment to provide climate science for federal decision-making, showing federal agencies' robust experience on climate science.

II.   **Plaintiffs' Requests to Rescind the M-Opinion and Address Climate Change in the ESA Consultation Regulations**

72.     In January, 2021, President Biden directed all federal agencies to use their authorities to address the climate crisis and to "immediately review and, as appropriate and consistent with applicable law, take action to address the promulgation of Federal regulations and other actions during the last 4 years" to protect our environment and confront the climate crisis. Exec. Order No. 13,990, 86 Fed. Reg. 7037 (Jan. 25, 2021).

73.     The Service has treated the 2008 M-Opinion as a de-facto prohibition on considering GHG emissions as having an effect on any listed species in any section 7 consultation. Consequently, in February of 2021, a group of preeminent scientists—including Plaintiff Stuart Pimm and several staff from the Center—formally requested that the Secretary rescind the M-Opinion such that all biological opinions follow the best available science as the ESA requires and consider greenhouse gas emissions when such emissions harm threatened and endangered species.

74.     The letter's signatories noted the scientific flaws in the M-Opinion. The scientists rebutted the M-Opinion's claims that the many contributing factors to climate change rendered the consideration of GHGs impossible at the outset. Attribution science has greatly improved

since the M-Opinion was authored, and the negative impacts of any *additional* GHG emissions can be analyzed, the letter explained.

75.     The signatories of the letter noted that rescinding the M-Opinion would greatly assist federal agencies in considering the effects of climate change on imperiled species and would effectuate President Biden's policy goal of requiring any federal permitting decision to consider the effects of GHG emissions and climate change.

76.     To date, the Department of the Interior and the Fish and Wildlife Service have not provided any response to the February 2021 letter requesting the rescission of the M-Opinion.

77.     In part because of the Secretary's inaction, the Center petitioned the Department of the Interior in March 2022 to amend the regulations governing consultations under the ESA to expressly include impacts to climate as an effect of an agency action. If such regulatory changes were made, the Service could no longer rely on the M-Opinion as a basis for ignoring climate change impacts from federal agency actions.

78.     To date, more than two years after submission of the petition (and three years after submission of the 2021 letter), the Center has received no response from Defendants. As a result, the Service continues to rely on the 2008 M-Opinion to disregard climate change–related impacts of federal actions in section 7 consultations.

III.    **Gulf Oil and Gas Drilling Threatens Imperiled Wildlife and Their Habitats**

79.     The Gulf of Mexico is a biologically rich environment, with a variety of different ecosystems including coral reefs, wetlands, oyster beds, and mangroves. These ecosystems provide habitat for a staggering array of life. The biological diversity of the Gulf of Mexico provides key ecosystem services and represents an important contribution to the Gulf Coast economy, including fisheries and tourism.

80.     Thousands of marine species live in the Gulf of Mexico, ranging from simple invertebrates such as slugs and sponges to complex and highly evolved fish, dolphins, and whales. It is also an important migratory route for birds—studies have shown that over two billion birds migrate across the Gulf each spring.

81.     Many of the species found in and around the Gulf of Mexico are protected as threatened or endangered under the ESA. This includes marine species like the Kemp's ridley sea turtle, loggerhead sea turtle, green sea turtle, leatherback sea turtle, hawksbill sea turtle, and West Indian manatee, as well as numerous species within the jurisdiction of NMFS.



*Hawksbill sea turtle. Photo credit: Brett Hartl*

82.     Several bird species found in the Gulf are also protected under the ESA, including the Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, roseate tern, rufa red knot, whooping crane, wood stork, Eastern black rail, and black-capped petrel.



*Whooping crane, Photo credit: Brett Hartl*

83.     Several endangered species of beach mice are also found on the Gulf, including the Alabama beach mouse, Choctawhatchee beach mouse, Perdido Key beach mouse, and St. Andrew beach mouse.

**IV.     Adverse Wildlife Effects of Federal Offshore Oil and Gas Activities**

84.     About 97 percent of offshore drilling in U.S. federal waters occurs in the Gulf of Mexico, and it is one of the most highly exploited continental shelf regions in the world. Thousands of oil and gas leases in the Gulf contribute to extensive offshore exploration and development activities: oil and gas drilling; vessel traffic; platform and pipeline construction; and more.

85.     Oil and gas activities on the Gulf of Mexico Outer Continental Shelf have numerous harmful effects on ESA-protected species.

A.      Sea Level Rise and Climate Change

86.      Gulf oil and gas production and combustion contributes to climate change, which is already threatening numerous species with extinction. Climate change is already impacting numerous bird species, leading to changes in migratory timing and distance; erosion and inundation of nesting habitat; harmful algal blooms; and extreme weather events.

87.      Recent research indicates that climate change may have substantial impacts on coastal bird communities in the Gulf of Mexico. One 2019 study concluded, for example, that "climate-mediated shifts in foundation species are likely impacting biodiversity of higher trophic level species and may exacerbate biodiversity change driven by the direct impacts of altered temperature and precipitation regimes." And the 2022 "State of the Birds Report" calls climate change a "major stressor" on seabird populations.

88.      The Cape Sable seaside sparrow, one of the endangered species analyzed in the Biological Opinion, is threatened by climate change. In a 2019 proposed amendment to the sparrow's recovery plan, the Service noted, "[c]limate change and sea level rise also represent significant short- and long-term threats to the [Cape Sable seaside sparrow] and its habitat." That analysis found some subpopulations will lose 40 percent of their habitat with a sea level rise of only one foot. A two-foot rise in sea level could see certain subpopulations lose nearly 100 percent of their habitat. When the Service revised the sparrow's critical habitat in 2007, it noted inundation may "destroy or adversely modify" the critical habitat. 72 Fed. Reg. 62,735, 62,755 (Nov. 6, 2007). A five-year review completed in 2010 on the bird's status found that "[h]igh water levels can flood nests or preclude [Cape Sable seaside sparrows] from nesting."

89.      The Mississippi sandhill crane is also harmed by climate change. Its latest five-year status review, which the Service initiated in 2010, found "climate change will add an

24

additional level of threat" and will "increase pressure on breeding cranes." The Service also noted that the species' designated critical habitat will be impaired.

90.     The 2010 five-year status review for the roseate tern detailed many impacts from climate change that are likely to impair the recovery of the species. "[E]rosion and overwashing of nests," increase in "frequency or intensity" of coastal storms, and changes to "availability of food sources" are all climate harms likely to affect the tern, the analysis found.

91.     The revised critical habitat designation for the piping plover recognized that climate change may bring about "high rates of sea-level rise as well as increases in the frequency and intensity of storms" that affect the species' critical habitat. 74 Fed. Reg. 23,476, 23,480 (May 19, 2009).

92.     The whooping crane is also at risk from a changing climate. In the latest five-year status review from 2012, the Service found that "[s]ea level rise and flooding of coastal wetlands is a major threat. Since whooping cranes mostly only use water < 20 inches deep, a projected sea level rise that could exceed 39 inches (0.99 m) by the end of the century . . . would make the current whooping crane winter range unusable." Such inundation would also destroy the crane's designated critical habitat. *See* 43 Fed. Reg. 20,938, 20,942 (May 15, 1978).

93.     Climate change also negatively affects nesting sea turtles in a variety of ways, including loss of nesting beaches (due to sea level rise and construction of protective structures like sea walls); changes to nesting timing and interval; loss of nests from extreme weather events; and changes to incubation temperatures and hatchling sex ratio. Climate change impacts sargassum habitat, which is critical for juvenile sea turtles. As the climate continues to warm, sargassum zone boundaries and nearshore currents may shift; water conditions may change, shifting sargassum abundance and distribution; and prey availability may change due to ocean

warming and acidification. Climate change-induced sargassum blooms exert sublethal stresses on nesting sea turtles by requiring them to expend additional energy searching for alternative, accessible nesting sites.

94.     The green sea turtle, one of six listed turtles analyzed in the Biological Opinion, is threatened by climate change. Per the 2016 rule revising the listing of eleven distinct population segments of green sea turtle, "[s]ea level rise is likely to reduce the availability and increase the erosion rates of nesting beaches, particularly on low-lying, narrow coastal and island beaches." 81 Fed. Reg. 20,058, 20,063 (Apr. 6, 2016). Other impacts to sea turtle nesting include "severe effects on nesting females and their eggs," [i]ncreased storm frequency and intensity," and "decreased egg and hatchling success." *Id*. Increased temperatures are also likely to increase the frequency of embryonic mortality and "the loss of male hatchlings." *Id*.

95.     Hawksbill sea turtles face similar climate threats. The Service's five-year status review completed in 2013 observed that the "loss of native vegetation cover on nesting beaches will increase the number of nests exposed to elevated temperatures due to climate and may impact natural sex ratios." It found that climate change's impacts on corals also affect the endangered hawksbill: "[c]limate change has led to massive coral bleaching events with permanent consequences for local habitats."

96.     The five-year status review for the Kemp's ridley sea turtle, published in 2015, listed sea level rise and temperature as two big threats to the species caused by climate change. Increases in temperature, it found, "are impacting the reproductive physiology of the Kemp's ridley, including nesting phenology and hatchling sex ratios." And sea level rise is a "potential problem" for the species, especially on low-lying beaches where the sea will inundate nesting sites.

97.     The Service found climate change also poses a threat to the endangered leatherback sea turtle in that species' five-year status review from 2013. There, the agency described the distortion to sex ratios that climate change is likely to cause; the impact of increased temperature on sex ratios within hatchling cohorts (skewing the population toward a female bias); inundation of nesting sites from sea level rise; and other harms such as increasing storm frequency.

98.     Finally, loggerhead sea turtles—the sixth listed turtle species in the Biological Opinion—are also threatened by climate change. A five-year status review, published in 2007, detailed several consequences that climate change was likely to have on the species. The analysis warned that "the sea will inundate nesting sites and decrease available nesting habitat." The Service designated some of the species' climate-threatened nesting beaches as critical habitat in 2014. 79 Fed. Reg. 39,856 (July 10, 2014).

99.     The Gulf sturgeon, the only fish species analyzed in the Biological Opinion, is also impacted by increased emissions and climate change. A 2009 five-year status review found that climate change–induced changes in habitat including more frequent extreme weather periods, warmer water temperatures, and saltwater intrusion caused by sea level rise were likely to negatively affect Gulf sturgeon habitat. These changes, plus second-order climate change effects, like an increasing likelihood of invasive species, may "outpace the ability of the Gulf sturgeon to adapt."

100.    As its name suggests, the Alabama beach mouse is a small rodent that burrows in frontal and scrub dunes on Alabama beaches. This endangered mouse is severely threatened by climate change. A 2009 five-year review found the Alabama's coasts lose up to one meter of beach for every one-centimeter rise in sea level, which means the Alabama beach mouse's

habitat could become completely inundated. The report observed that estimates for sea level rise in the species habitat was predicted to be a minimum of 38 centimeters over the next century, resulting in massive losses of habitat for the Alabama beach mouse.

101.    The Choctawhatchee beach mouse too is likely to suffer from rising oceans. Its five-year review, which began in 2016 and was published in 2019, found that a three-foot rise in sea level creates "permanent barriers" preventing habitat connectivity. Sea level rise and "increasing storm surge" threaten this endangered species' recovery.

102.    The 2014 five-year review for the Perdido Key beach mouse described sea level rise and increasing storm surge events, both increasingly likely due to climate change, as threats to the species. The Perdido Key beach mouse's limited habitat becomes disconnected with a two-foot rise in sea level, and a six-foot rise causes a "[s]ignificant loss."

103.    Climate change also poses a threat to West Indian manatees by increasing extreme weather events (e.g., tropical storms and hurricanes) that can lead to increased mortality from standings, loss of food resources, mother-calf separations, and habitat loss and alterations. Climate change will also lead to increased harmful algae blooms that will have increasingly toxic impacts on manatees and disease.

**B.    Oil Spills**

104.    Oil and gas activities also cause oil spills that harm threatened and endangered wildlife, including birds, sea turtles, manatees, and other species. Direct impacts to wildlife from oil exposure include behavioral alteration; suppressed growth; induced or inhibited enzyme systems; reduced immunity to disease and parasites; lesions; tainted flesh; and chronic mortality. Oil can also exert indirect effects on wildlife through reduction of key prey species.

105.    Oil destroys the waterproofing and insulating properties of feathers and fur of birds and mammals, respectively, thereby compromising their buoyancy and ability to

thermoregulate. Oiled shores can affect nesting and foraging areas of bird species. Oiled adult birds returning to the nest can contaminate their eggs and chicks with oil. Studies on the effects of oil on eggs have shown significant mortality and developmental defects in embryos. Oiled birds are also at high risk of ingesting oil when they preen their feathers. Ingested oil can damage the gastrointestinal tract—evidenced by ulcers, diarrhea, and a decreased ability to absorb nutrients—and inhibit proper hormone function.

106.    Sea turtles are highly susceptible to contaminants because of their long lifespans and lack of effective detoxification methods. Oil harms imperiled sea turtles via myriad avenues of exposure. According to an analysis undertaken in the aftermath of the Deepwater Horizon disaster, effects of oil exposure include "[i]mpairment of stress responses and adrenal gland function, cardiotoxicity, immune system dysfunction, disruption of blood cells and their function, effects on locomotion, and oxidative damage." Ryan Takeshita et al.*, A review of the toxicology of oil in vertebrates: what we have learned following the Deepwater Horizon oil spill.* 24(8) J. of Toxicology & Env't Health, Part B, 355, 355 (2021). High exposure to oil results in multi-organ system failure. These impacts are not limited to turtles directly exposed to contaminants. Maternal transfer of lipophilic components of oil and their associated metabolites to sea turtle eggs can occur, with implications for early life development and survival. On land, oil spills harm sea turtles in a variety of ways. For example, eggs exposed to oil on nesting beaches or via egg-laying by an oiled female suffer increased mortality from smothering or exposure to toxicants. Clean up activities associated with oil spills also can harm sea turtles by, for example, mechanized beach clean-ups that crush nests or disrupt nesting behavior.

107.    Hatchlings are particularly vulnerable to the effects of oil because of their small size and inability to escape convergence zones that collect small turtles, seaweed, and oil. Among

these effects are declining red blood cell counts and increased white blood cell counts; impaired ability to regulate the internal balance of salt and water; and sloughing of the skin that can lead to infection.

108.    The 2023 designation of green sea turtle critical habitat found oil spills and associated cleanup activities pose a significant threat to the species and their habitat. 88 Fed. Reg. 46,376, 46,385–86 (July 19, 2023).

109.    Manatees are also threatened by oil spills through harm to both seagrass beds and individual animals. Manatees may be exposed to contaminants directly through dermal contact, inhalation, aspiration, or ingestion. Impacts may include severe and possibly fatal lung, liver, and kidney disorders. Previous five-year status reviews for the listed West Indian manatee identified oil spills as a threat. *See, e.g.*, 82 Fed. Reg. 16,668, 16,691 (Apr. 5, 2017).

### C.    Light and Noise Pollution

110.    Noise and light pollution associated with oil and gas operations negatively impact bird health and fitness. Artificial light attracts birds at night and disrupts their normal foraging and breeding activities in several ways. In a phenomenon called light entrapment, the birds continually circle lights and flares on vessels and energy platforms, instead of foraging or visiting their nests, which can lead to exhaustion and mortality. Seabirds such as shearwaters and petrels are especially vulnerable to light entrapment.

111.    Noise produced by vessels and other oil and gas activities harms manatees as well. For example, noise from vessels can reduce the time manatees spend feeding. Manatees also spend less time milling and socializing with one another when there are high levels of noise. Such impacts result in reduced reproductive success and physical separation of potential breeding individuals, ultimately precluding mating opportunities and affecting the genetic fitness

of the population. Heavy vessel traffic also obstructs manatees' use of certain warm-water refugia and results in mother-calf separation.

### D.   Collisions with Platforms and Vessels

112.    Seabirds frequently collide with lights or light structures associated with oil and gas activities, thereby causing injury or mortality. Seabirds also collide with lighted platforms where they are vulnerable to injury, oiling, or other feather contamination, and exhaustion. A 2015 BOEM study estimated that platforms in the Gulf of Mexico kill roughly 200,000 birds each year via collisions, equating to approximately 50 birds per platform. The study noted that these estimates should be considered conservative given they do not account for issues related to detection bias. As such, even more birds may be killed each year by collisions with Gulf of Mexico platforms than these numbers reflect.

113.    Vessel strikes associated with oil and gas operations also pose a significant threat to West Indian manatees. Manatees hit by vessels often suffer fatal injuries from sharp, penetrating trauma from propeller blades or blunt, crushing trauma from hull collisions. Both types of injury can result in death from extensive hemorrhage and tissue damage. Vessel strikes are the leading cause of anthropogenic manatee mortality in Florida where the cause of death could be determined. Furthermore, most manatees with vessel strike–related mortality are adults, which is especially concerning for the recovery of the population, as life history modeling shows that adult manatee survival is the most important parameter in maintaining positive population growth rates for this species.

### V.   The 2018 Biological Opinion on Gulf Oil and Gas Drilling

114.    According to the 2018 Biological Opinion, there have been multiple section 7 consultations on oil and gas activities in the Gulf of Mexico. The original consultation for oil and gas activities occurred in 1979, and consultations were reinitiated six times between 1979 and

2010. Additionally, the Service consulted on one lease sale in 2001 and nine lease sales in 2002–2003. Each of the related biological opinions concluded that incidental take of federally listed species was not anticipated for oil and gas operations. The Service also concluded that none of the lease sales were likely to adversely affect any listed species—meaning no individuals of any listed species would be injured at all by any leasing activities. Consistent with the 2008 M-Opinion, in none of these consultations did the Service consider the extent to which the authorized oil and gas operations would contribute to climate change–related impacts on endangered and threatened species.

115.    In 2010, the Deepwater Horizon drilling rig exploded in the Gulf of Mexico, unleashing one of the worst environmental disasters in U.S. history. More than 4.9 million barrels (more than 200 million gallons) of oil spilled out of a damaged well over the course of 87 days. The spill fouled more than 1,000 miles of coastline and killed hundreds of thousands of marine animals. Many more have been harmed and harassed due to sublethal impacts that have impaired their breeding, feeding, sheltering, and other essential life functions. The spill injured or killed thousands of endangered and threatened species, including Gulf sturgeon, sea turtles, seabirds, dolphins, and whales. Scientists are still discovering the far-reaching and ongoing harms from the spill.

116.    Following the spill, in 2010 the Service, BOEM, and BSEE began the process of reinitiating consultation on federally approved Gulf oil and gas activities that impact threatened and endangered species and designated critical habitat under the Service's jurisdiction. BOEM and BSEE sent the Service their Biological Assessment in February 2014. Following a request for more information, the Bureaus sent an updated Biological Assessment in August 2015. Following another request for additional information, the Bureaus finally sent the information

the Service deemed sufficient to initiate formal consultation in March 2016—six years after the Deepwater Horizon rig exploded.

117.    The Service issued its Biological Opinion on April 18, 2018. In it, the Service purports to take "a programmatic approach for oil and gas activities in the [Gulf of Mexico]" covering all oil and gas leases held during the following ten years, including all associated exploration, development, and decommissioning activities BOEM and BSEE authorize under new and existing leases as well as geological and geophysical permits issued during the ten-year period. Because the lifespan of activities under an oil and gas lease sale is generally up to 40 years, the Biological Opinion covers 50 years of activities.

118.    In the Biological Opinion, the Service purported to consider the impacts of these activities on nesting Kemp's ridley and loggerhead sea turtles, the Cape Sable seaside sparrow, the Mississippi sandhill crane, the piping plover, the roseate tern, the rufa red knot, the whooping crane, the wood stork, the Alabama beach mouse, the Perdido Key beach mouse, the St. Andrew beach mouse, and the West Indian manatee. It also purported to consider the impacts on designated critical habitat for the loggerhead sea turtle, Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, and whooping crane.

119.    The Service concurred with the Bureaus' determination that Gulf oil and gas activities are "not likely to adversely affect" leatherback sea turtles, green sea turtles, hawksbill sea turtles, roseate terns, or wood storks.

120.    For all other species, the Service concluded that Gulf oil and gas activities "are not likely to jeopardize the[ir] continued existence . . . and are not likely to destroy or adversely modify their designated critical habitat, if any."

**VI.** **The 2018 Biological Opinion's Failure to Address Oil and Gas Drilling Impacts on Climate Change**

121.    Although approving new oil and gas activity increases greenhouse gas emissions, the Biological Opinion does not at all consider the impacts or harm from such increased emissions on climate-threatened species or their critical habitats. Such failure is particularly blatant considering the Biological Opinion covers many decades of oil and gas activity and concedes that climate change poses grave threats to a number of species discussed in the Opinion.

122.    For example, the Biological Opinion concedes that "[n]umerous studies have documented accelerating rise in sea levels worldwide" due to climate change and that "red knots face imminent threats from loss of habitat caused by sea level rise." The Opinion likewise acknowledges that "climate change may have . . . severe impacts on whooping crane reproduction" and make "much of the present acreage [of habitat in Texas] too deep for use by whooping cranes." Yet the Opinion contains no mention of, let alone any analysis regarding, the additional effect of 50 years' worth of oil and gas drilling on these and other dire climate-related impacts on listed species.

123.    On information and belief, the omission of climate change impacts from the Biological Opinion is a direct result of the M-Opinion's declaration that such impacts should be disregarded in Service consultations.

124.    Over the 50 years of activities covered in the Biological Opinion, Gulf oil and gas production will result in the release of billions of tons of planet-warming greenhouse gas emissions. Using BOEM's own projections, the activities under this Biological Opinion will result in the production of more than 730 million barrels of oil per year. They will also produce more than 2 million thousand cubic feet of natural gas per day.

125.   Combustion of the oil and gas produced under this Biological Opinion could result in more than 350 million metric tons of carbon dioxide released into the atmosphere every year. Over just the first ten years of the Biological Opinion, more than 3.5 billion tons of carbon dioxide could be released; over the full 50 years of activity covered in the Biological Opinion, more than 17.5 billion tons of carbon dioxide could be released to the atmosphere.

126.   In addition to ignoring the climate-related impacts of oil and gas drilling, the Biological Opinion's consideration of climate change is deficient in other respects. The Opinion's brief discussion of "cumulative effects" contains no mention of climate change. As for the environmental baseline, the Opinion fails to address how climate change will adversely impact a number of species over the half-century the Opinion covers. For example, despite recognizing that "[n]umerous studies have documented accelerating rise in sea levels," the Biological Opinion does not consider that threat to nesting Kemp's ridley or loggerhead sea turtles. Nor does it consider the other impacts of climate change on these sea turtle populations, such as altered sex ratios and hatchling mortality from warming temperatures. Such failures are particularly glaring considering the Service's recognition that "activities that continue to affect the survivability of turtles on their remaining nesting beaches . . . will seriously reduce the Service's ability to conserve sea turtles."

## VII.   The Biological Opinion Also Fails to Adequately Address Other Impacts

127.   While acknowledging that oil spills may adversely affect endangered and threatened species and their critical habitats in the Gulf, the Biological Opinion arbitrarily minimizes, and otherwise fails to address, the harms associated with such spills. For example, the Biological Opinion states that "BOEM and BSEE continue to maintain that a low-probability catastrophic spill is not reasonably certain to occur" and therefore potential impacts to various species "associated with a spill of this magnitude are not addressed." In addition to deferring to

other agencies, the Opinion's assumption that a catastrophic spill is unlikely is based only on wells and ignores the risk of such spills from pipelines, tankers, and barges. The Opinion also does not consider that oil companies are drilling in deeper waters, which increases the risk of spills. Studies have shown, for example, that the probability of a serious accident, fatality, injury, explosion, or fire being reported increases by 8.5 percent with each additional 100 feet of depth at which an offshore platform operates. This is true regardless of the platform's age or the quantity of oil or gas produced. The increased risk comes from working under greater pressure—both from the weight of water and the greater pressure within the oil and gas pockets. Additionally, NMFS found in an analysis of the same oil and gas activities that a reasonable estimate of the largest possible spill size has a median of 1.1 million barrels. It based this determination on an examination of what it labeled as the "Best Available Information on the Largest Potential Spill," which included studies "calculat[ing] an approximate return frequency (i.e., occurrence) of an event the size of [Deepwater Horizon] as of once every 17 years."

128.    While discounting the threat of a "catastrophic" oil spill, the Biological Opinion states that "BOEM/BSEE has determined that up to one spill" of "greater than 10,000 barrels in size"—equivalent to more than 420,000 gallons of oil—"is likely to occur over the 40-year period analyzed." The Opinion does not reconcile this finding of a likely major oil spill with the Opinion's conclusion that the authorization of extensive oil and gas drilling will not jeopardize any species, impair any critical habitat, or even cause the take of a single individual endangered or threatened species.

129.    The Biological Opinion fails to conduct a proper jeopardy analysis and instead compares the effects of the agency action on the species to other threats. For example, the

Biological Opinion simply lists some of the cumulative effects that ESA-listed species are forced

to endure. It does not consider those effects when added to the baseline and effects of the action.

130. The Biological Opinion also improperly relies on uncertain and non-binding

mitigation measures in reaching its no jeopardy and no take determinations. For example, the

Service relies on a notice to lessees that it claims will reduce the risk of vessel strikes. But that

notice contains only voluntary measures, it does not mandate any particular action and does not

even apply to manatees. The Biological Opinion also discounts the risk to nesting sea turtles

from an oil spill by pointing to "regulations, requirements, and recommendations that should

prevent or reduce the likelihood of a spill occurring and prevent or reduce impacts to sea turtles

if a spill occurs." But apart from a brief list of some of those regulations, the Biological Opinion

nowhere specifies what any of those measures are. Similarly, the Biological Opinion states that

onshore impacts from development related to offshore oil and gas activity will be minimal,

because projects "with a federal nexus [are required] to avoid or minimize impacts to listed

species and their critical habitats," but nowhere does it specify what measures are required.

131. The Biological Opinion also unlawfully fails to include an incidental take

statement for take reasonably certain to occur. Rather, the Biological Opinion states that the

Service "does not anticipate the proposed action will incidentally take any listed species under

[its] jurisdiction." The conclusion that not a single member of a listed species will be killed,

injured, harmed, harassed, or otherwise taken as a result of extensive oil and gas operations over

decades is unsupported and conflicts with the best available science.

132. For example, the Opinion concedes that vessel strikes pose a grave threat to

manatees, noting that BOEM and BSEE have recognized that "[m]anatees could be killed or

injured by a collision with a service vessel" and "[s]ervice and support vessels traveling through

coastal areas to and from oil and gas structures have the potential to impact manatees by vessel collisions." The Service's Biological Opinion discounts the probability of such events occurring by pointing to Notice to Lessees 2016-G01 "Vessel Strike Avoidance and Injured/Dead Protected Species Reporting." But the measures contained in that notice are voluntary and only apply to cetaceans and whales, not manatees. Even if they were mandatory and applied to manatees, they would still be insufficient as they require vessels to slow to 10 knots or less, when the science demonstrates that manatees are susceptible to strikes from vessels operating at speeds as low as 2.2 knots. The Notice to Lessees therefore cannot be relied on to reduce risk to manatees. Similarly, the best available science indicates that ESA-listed birds will be taken via collisions with oil and gas infrastructure; changes in habitat use, foraging, and nesting behavior from associated noise and light pollution; acute sublethal stress from nocturnal circulation around offshore oil and gas platforms; and exposure to pollution.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### The Biological Opinion Violates the
### Endangered Species Act and Administrative Procedure Act

133.   Paragraphs 1 through 132 are hereby realleged as though set out in full.

134.   In completing its Biological Opinion under section 7(a)(2) of the ESA, the Service was required to determine—based on the best available scientific data—whether the direct and indirect effects of the agency action, when considered in conjunction with the environmental baseline and cumulative effects, are likely to jeopardize the continued existence of a species or result in the destruction or adverse modification of its critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.02, 402.14(g). In apparent reliance on the 2008 M-Opinion, and without engaging in any analysis of the best available science available as of 2018, the

Biological Opinion entirely fails to address the climate change–related effects of oil and gas drilling in the Gulf of Mexico, in conjunction with cumulative effects and the environmental baseline, on endangered and threatened species and/or their critical habitats, including the Kemp's ridley sea turtle, loggerhead sea turtle, Cape Sable seaside sparrow, Mississippi sandhill crane, piping plover, rufa red knot, whooping crane, several species of beach mice, and manatee. The failure to factor climate change impacts into the analysis of effects resulting from the agency action, along with cumulative effects and the baseline condition of impacted species during the entire life of the action, violates the ESA and is arbitrary, capricious, an abuse of discretion, and contrary to law, in violation of the APA. 5 U.S.C. § 706(2).

135.    In contravention of the ESA, the Biological Opinion fails to adequately consider whether oil spills resulting from extensive oil and gas operations in the Gulf of Mexico will jeopardize endangered and threatened species and/or impair their critical habitats. Although Congress imposed on the Service the obligation to address the impacts of agency actions on listed species, the Service improperly delegated to other agencies the analysis of the likelihood of a catastrophic oil spill and, on that basis, entirely failed to assess the impacts associated with such a spill. As to spills of less but still significant impact, the Biological Opinion arbitrarily, and in contravention of the best available science, fails to address the full extent of the risks posed by oil and gas operations and their impacts on listed species and their critical habitats, including those species referenced in paragraph 134. The Opinion therefore violates the ESA and is otherwise arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2).

136.    When a biological opinion relies on mitigation measures to conclude that an action will not jeopardize a species, impair critical habitat, and/or result in incidental take, those

measures must be specific, binding, and reasonably certain to occur. The 2018 Biological

Opinion relies on uncertain, vague, and non-binding mitigation measures in reaching its no

jeopardy and no take conclusions, including with regards to manatees, sea turtles, and other

species. Such reliance violates the ESA and is otherwise arbitrary, capricious, an abuse of

discretion, and not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2).

137.   A biological opinion must include an incidental take statement for any take that is

reasonably certain to occur from the action. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g)(7). The

Biological Opinion fails to include an incidental take statement that would account for,

minimize, require the reporting of, and authorize take of ESA-listed species, including the take

of nesting sea turtles, manatees, and birds that is reasonably certain to occur from Gulf drilling

activities. Instead, the Opinion arbitrarily and in contravention of the best available evidence

concludes that not a single member of a listed species will be killed, injured, harmed, harassed,

or otherwise taken over the course of many decades. The omission of any incidental take

statement under these circumstances violates the ESA and is otherwise arbitrary, capricious, an

abuse of discretion and contrary to law in violation of the APA. 5 U.S.C. § 706(2).

**SECOND CLAIM FOR RELIEF:**
**The Service's Unreasonable Delay in Responding to**
**the Center's Petition Violates the Administrative Procedure Act**

138.   Paragraphs 1 through 132 are hereby realleged as though set out in full.

139.   The APA provides that each federal agency "shall give an interested person the

right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e).

140.   Under the APA, each federal agency "shall proceed to conclude a matter presented

to it" "within a reasonable time." 5 U.S.C. § 555(b). More than three years have elapsed since

February 11, 2021, when Plaintiffs requested that Defendants rescind the 2008 M-Opinion. By

failing to act on the request, Defendants are in violation of the APA. *Id.*

141.     More than two years have elapsed since March 8, 2022, when the Center sent a rulemaking petition to Defendants. By failing to act on the petition, Defendants are in violation of their obligation to act within a reasonable time. 5 U.S.C. § 555(b). Defendants' delay is especially unreasonable because the M-Opinion continues to impede the Service's ability to conduct ESA section 7 consultations that properly take climate change effects into consideration. In turn, this ongoing subversion of the consultation process has and will continue to put imperiled species at grave risk of extinction.

142.     Defendants' failure to act on the Center's 2022 petition constitutes an agency action unlawfully withheld and unreasonably delayed within the meaning of the APA. 5 U.S.C. § 706(1).

143.     The APA authorizes this Court to "compel agency action . . . unreasonably delayed." 5 U.S.C. § 706(1).

144.     Plaintiff Center for Biological Diversity and its members are harmed and will continue to be harmed by Defendants' unlawful, unreasonable delay in acting on the 2022 petition. Granting Plaintiffs' requested relief will remedy these harms.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.     Declare the Service's Biological Opinion violates the ESA and APA;

2.     Vacate and remand the Service's Biological Opinion;

3.     Declare the Service's Biological Opinion is arbitrary, capricious, and otherwise unlawful, including because of its apparent reliance on the M-Opinion;

4.     Order the Secretary of Interior to respond to the Center's 2022 rulemaking petition by a date-certain;

5.     Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

6.     Grant such other relief as the Court deems just and proper.

Respectfully submitted this 8th day of April, 2024,

/s/ *Julie Teel Simmonds*
Julie Teel Simmonds (DC Bar No. CO0091)
Kristen Monsell (DC Bar No. CA00060)
David Derrick (*pro hac vice* forthcoming)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137 Telephone
(510) 844-7150 Fax
jteelsimmonds@biologicaldiversity.org
kmonsell@biologicaldiversity.org
dderrick@biologicaldiversity.org

*Attorneys for Plaintiffs Center for*
*Biological Diversity and Stuart Pimm*