## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al*., <br><br>      *Plaintiffs*, <br><br>    v. <br><br> DEBRA HAALAND, *et al*., <br><br>      *Defendants,* <br><br>   *and* <br><br> AMERICAN PETROLEUM INSTITUTE, <br><br>      *Defendant-Intervenor*. | No. 24-cv-00990 (DLF) |

## STIPULATION AND JOINT MOTION TO STAY PROCEEDINGS

Pursuant to Local Rules 7 and 84.7, Federal Defendants Debra Haaland, *et al*., and Plaintiffs Center for Biological Diversity, *et al*., (collectively, "Parties") stipulate and respectfully request that the Court stay this litigation through **March 28, 2025**. Defendant-Intervenor American Petroleum Institute does not join in the Stipulation, but it also does not oppose the requested stay of litigation. The grounds for this Stipulation and Joint Motion are as follows:

1.     On April 20, 2018, the U.S. Fish and Wildlife Service ("FWS") issued its Biological Opinion on the effects of the Bureau of Ocean Energy Management's ("BOEM") and the Bureau of Safety and Environmental Enforcement's ("BSEE") (collectively, "the Bureaus") proposed oil and gas leasing, exploration, development, production, decommissioning, and all

related activities in three planning areas within the Gulf of Mexico's Outer Continental Shelf ("GoM OCS") ("2018 Biological Opinion"). FWS issued the 2018 Biological Opinion under Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2). *See also* 50 C.F.R. Part 402 (ESA consultation regulations). On March 6, 2024, the Bureaus requested the reinitiation of consultation, and the reinitiated ESA consultation is ongoing.

2.      Plaintiffs filed this action on April 8, 2024, raising two claims for relief. Plaintiffs' first claim for relief challenges FWS's 2018 Biological Opinion. *See* Complaint, ECF 1 ¶¶ 133-137. Plaintiffs' second claim alleges that FWS unreasonably delayed by failing to respond to the Center for Biological Diversity's March 8, 2022, Petition for Rulemaking. *Id.* ¶¶ 138-144. Federal Defendants filed their answer on June 21, 2024 (ECF 16), and the Court granted American Petroleum Institute's June 12, 2024, motion to intervene on September 23, 2024 (ECF 22).

3.      The Court referred the Parties to mediation on July 11, 2024, and a mediation conference was held on September 25, 2024. Pursuant to LCvR 84.7, this Stipulation contains all of the terms of agreement reached during mediation.[1]

4.      As noted, the Bureaus reinitiated consultation with FWS over the 2018 Biological Opinion, and the reinitiated ESA consultation is ongoing. Without conceding it is legally required to do so, FWS agrees to coordinate with the Bureaus and, as is appropriate under applicable laws and regulations, address each of the points below during the reinitiated ESA consultation:

---

[1] The Parties agree that the agreements stated herein become effective only upon entry of a Court order staying this litigation through March 28, 2025, and that they are not waiving confidentiality over the mediation discussions that led to this Stipulation. The Parties further agree that nothing in the Stipulation may be construed to waive or relinquish any legal rights, claims, or defenses in this or any future litigation.

a.     Whether, or the extent to which, FWS must analyze the effects of very large or catastrophic oil spills on threatened or endangered species under its jurisdiction as part of the reinitiated ESA consultation;

b.     Whether, or the extent to which, FWS must analyze the effects of sea level rise on nesting Kemp's ridley sea turtles (*Lepidochelys kempii*), loggerhead sea turtles (*Caretta caretta*), beach mice (*Peromyscus polionotus ammobates; Peromyscus polionotus allophrys, Peromyscus polionotus trissyllepsis, Peromyscus polionotus peninsularis*), or other threatened or endangered species under its jurisdiction as part of the reinitiated ESA consultation;

c.     Whether, or the extent to which, FWS must analyze as an "effect of the action" (50 C.F.R. § 402.02) greenhouse gas emissions from the Bureaus' proposed action, including downstream emissions, as part of reinitiated ESA consultation;

d.     Whether, or the extent to which, FWS must analyze the effects of lighting on offshore oil and gas platforms and applicable infrastructure on ESA-listed threatened and endangered species under its jurisdiction as part of the reinitiated ESA consultation.

5.     FWS agrees only to address the points in Paragraph 4 as is appropriate under governing laws and regulations. The Parties therefore agree that this Stipulation may not be construed to either (a) limit or modify FWS's authority or discretion under applicable laws, or (b) provide the legal basis for a new claim for relief against Federal Defendants in this or any future litigation. Plaintiffs reserve their rights to challenge the new consultation decisions, including FWS's consideration of the issues identified in Paragraph 4 (or lack thereof) as a violation of the ESA, and Federal Defendants preserve and do not waive any claims or defenses in this or future litigation.

3

6.      FWS agrees to continue coordinating with the Bureaus as appropriate and by March 28, 2025, or a later deadline ordered by the Court pursuant to Paragraph 8.a., complete the reinitiated ESA consultation by taking one of the actions identified in 50 C.F.R. § 402.14(m). FWS agrees to make best efforts to comply with this deadline. If there are unforeseen circumstances that interfere with FWS's ability to meet the deadline, FWS will promptly advise the other Parties of the circumstances and confer on an appropriate resolution.

7.      Plaintiffs agree to narrow their second claim for relief to the allegations that FWS failed to respond to the 2022 Petitions' text on pages 8-9 and the corresponding proposed regulatory text identified in Attachment 1, and to refrain from bringing any new or additional claims against FWS or the National Marine Fisheries Service ("NMFS") for failing to respond to the 2022 Petition for two years from the date this Stipulation is filed. Without conceding it is legally required to do so, FWS agrees to respond, as is appropriate and permissible under applicable laws and regulations, to the specific parts of the petition identified in the first sentence of this Paragraph by March 28, 2025. In preparing its response, FWS will make efforts to coordinate with NMFS. Plaintiffs reserve their rights to file new claims (or cases) challenging FWS's response to the specific parts of the petition identified in the first sentence of this Paragraph or to raise new or additional claims against FWS or NMFS over the 2022 petition after the two-year period has expired, and Federal Defendants preserve and do not waive any claims or defenses.

8.      This Court has "broad discretion" in deciding whether to stay proceedings. *Clinton v. Jones,* 520 U.S. 681, 706 (1997). The power to stay proceedings is "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254-

55 (1936). Considering the foregoing, the Parties agree that a stay of litigation—through March 28, 2025—pending Federal Defendants' completion of the ongoing ESA consultation process and FWS's response to the Center for Biological Diversity's narrowed Petition will conserve the Parties' and Court's resources and is warranted under the present circumstances. The Parties therefore request that the Court stay the litigation through March 28, 2025, subject to these conditions:

> a.    Following conferral under LCvR 7(m), any Party may file a motion seeking to lift or extend the stay where good cause is shown based on new circumstances arising after this Stipulation becomes effective;

> b.    The Parties may request mediation with the Magistrate Judge to address any disputes over this Stipulation arising during the term of the stay, but only after the Parties have exhausted good faith efforts to resolve any disagreement prior to requesting mediation;

> c.    Within 21 days after the expiration of the stay, the Parties will provide a joint status report proposing a schedule for further proceedings, if any.

For the foregoing reasons, the Parties agree and respectfully request that the Court stay the litigation pursuant to the conditions discussed above. A proposed order is filed concurrently with this Stipulation and Joint Motion.

Dated: December 5, 2024

*/s/ David Derrick*
David Derrick (pro hac vice)
Kristen Monsell (DC Bar No. CA00060)
Julie Teel Simmonds (DC Bar No. CO0091)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137 Telephone
(510) 844-7150 Fax
dderrick@biologicaldiversity.org

kmonsell@biologicaldiversity.org
jteelsimmonds@biologicaldiversity.org

*Attorneys for Plaintiffs Center for Biological Diversity and Stuart Pimm*

TODD KIM, Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

*/s/ Michael R. Eitel*
MICHAEL R. EITEL (NE Bar No. 22889)
DAVIS A. BACKER (CO Bar No. 53502)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street, South Terrace, Suite 370
Denver, Colorado 80202
Tel: (303) 844-1898 (Backer)
Tel: (303) 844-1479 (Eitel)
Email: davis.backer@usdoj.gov
Email: michael.eitel@usdoj.gov

*Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2024, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of this filing to the attorneys of record.

*/s/ Michael R. Eitel*
*Attorney for Federal Defendants*

# ATTACHMENT 1

Before the Secretary of Interior and Secretary of Commerce

# PETITION TO STRENGTHEN THE U.S. ENDANGERED SPECIES ACT

# TO SAVE LIFE ON EARTH FROM THE GLOBAL EXTINCTION CRISIS





## MARCH 8, 2022

## CENTER FOR BIOLOGICAL DIVERSITY

*Photo credit:* Red wolf. B. Bartel, USFWS; Northern spotted owl. Tom Kogut, USDA Forest Service; Dugong by Julien Willem; Miami blue butterfly. Flickr/Bill Bouton

 CENTER *for* BIOLOGICAL DIVERSITY

# EXECUTIVE SUMMARY

Extinction is not inevitable – it is a political choice. The U.S. has one of the best tools to end extinction—the Endangered Species Act—and for nearly 50 years the law has been considered the gold standard for conservation. The Act has had tremendous success since its enactment in 1973, saving 99% of plants and animals under its care from extinction and putting hundreds of listed species—including bald eagles, gray whales and American alligators—on the road to recovery.

Yet despite the strong protections the Act provides, the U.S. Fish and Wildlife Service ("FWS") and the National Marine Fisheries Service ("NMFS") (hereinafter "the Services") have been reticent to fully implement the Endangered Species Act's ("ESA" or "Act") most powerful provisions, keeping the law from realizing its full potential. The Services have suffered from years of overt political and industry pressure designed to weaken the Act. As a result, the Service's implementation of the Act is no longer primarily driven by the best science or conservation principles as the law envisions, but instead they are motivated more and more by avoiding political controversy.

Under the Act, for example, the FWS is required to consult with federal agencies and ensure actions they fund, permit, or carry out avoid jeopardizing listed species or adversely modifying their critical habitat. In recent decades, however, the FWS almost never concludes that federal agencies are jeopardizing listed species or adversely modifying their critical habitat, which would have resulted in projects being stopped or substantially modified to avoid harm to endangered species.[1] It is also exceedingly rare for either of the Services to prosecute private parties for destruction of habitat. Instead, enforcement of the "take" prohibition, which by definition includes habitat destruction, has for the most part been limited to direct killing of listed species. The Services have frequently had to be sued to perform their most basic duties under the Act—listing species and designating critical habitat—leaving many species waiting over a decade for protections and only roughly 40% of listed species having critical habitat designated.[2]

As a result, many unique species that could have been saved are now gone forever. Most recently, the FWS made the heartbreaking decision to remove 22 animals and one plant from the endangered species list because of extinction.[3] For the majority of these species, the primary threats driving their decline were not addressed in time and the Act's protections simply came too late. But for some species like the Po'ouli — a unique snail-eating songbird from Hawaii — the Fish and Wildlife Service simply failed to take enough action in time and the species went extinct in 2004. These species now join the list of 650 other species of wildlife and plants that have been lost to extinction in the United States.

---

[1] Of the 88,290 consultations recorded by FWS from 2008-2015, the agency only made a jeopardy determination twice. Jacob W. Malcom & Ya-Wei- Li, *Data Contradict Common Perceptions about a Controversial Provision of the US Endangered Species Act*, 52 Proc. Nat'l Acad. Sci. (PNAS) 15,844 (2015).

[2] Schwartz, M.W., 2008. The performance of the Endangered Species Act. Annu. Rev. Ecol., Evol., Syst. 39, 279_299. *available at*: https://doi.org/10.1146/annurev.ecolsys.39.110707.173558.

[3] 86 Fed. Reg. 54298 (Sept. 30, 2021), *available at*: https://www.govinfo.gov/content/pkg/FR-2021-09-30/pdf/2021-21219.pdf.



Globally, one million animal and plant species face extinction within the coming decades.[4] Millions more are declining as habitat loss, climate change, wildlife exploitation, pollution, and other human activities continue to threaten their survival. The population of North Atlantic right whales dropped nearly 10% in 2020, leaving only 336 surviving individuals—the lowest number in nearly two decades.[5] In North America alone, almost two-thirds of bird species have declined over the past few decades.[6] Scientists are warning of an insect apocalypse as populations of once-common pollinators and other insects plummet around the world.[7] The eastern monarch butterfly population has declined by 85% in just two decades, while the western population has crashed by 95%.[8]

Now more than ever, we need strong protections for our most imperiled species and the wild places they live if we are to stem the extinction crisis and save life on earth. The Endangered Species Act remains one of the world's strongest conservation laws, yet it has been cynically targeted by past administrations seeking to weaken it in order to appease the oil and gas industry, land developers, wildlife traders, and other exploiters whose actions are driving hundreds of endangered species to extinction.

The Trump administration caused unprecedented damage to the Act, significantly dismantling the federal government's ability to protect our nation's imperiled species while giving industry free rein to continue destroying our planet.[9] In addition to eviscerating the implementation of sections 4 and 7 of the Act—including stripping the "blanket 4(d) rule" that provided threatened species with the same level of protection that endangered species receive—the Trump administration adopted policies that further weakened the law, even going so far as to issue guidance to FWS biologists to not tell private landowners that they need a permit if their activities will harm a listed species.[10] Thus, first and foremost, this petition urges the Services to repeal all the guidance documents, policies, and regulations that were enacted during the Trump

---

[4] S. Diaz, J. Settele, E. Brondizio. 2019. Summary for policymakers of the global assessment report on biodiversity and ecosystem services of the Intergovernmental Science-Policy Platform on Biodiversity and Ecosystem Services *available at*: https://www.ipbes.net/news/Media-Release-Global-Assessment

[5] Population of North Atlantic right whales continues it downward trajectory, New England Aquarium (Oct. 25, 2021), *available at*: https://www.neaq.org/about-us/news-media/press-kit/press-releases/population-of-north-atlantic-right-whales-continues-its-downward-trajectory/

[6] Rosenberg, L. V. et al. *Decline of the North American avifauna*. Science (2019).

[7] Goulson, D. *The insect apocalypse, and why it matters*. Current Biology, 29(19) (2019).

[8] Brower, Lincoln P., et al. *Decline of monarch butterflies overwintering in Mexico: is the migratory phenomenon at risk?* Insect Conservation and Diversity 5.2 (2012).

[9] As of January 2022, the Biden administration has taken action to rescind two Trump-era regulations limiting habitat protections for endangered species. *See Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat* (rescinding the regulatory definition of "habitat"), 86 Fed. Reg 59353 (Oct. 27, 2021); *see also Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat* (rescinding the December 18, 2020 final rule titled "Endangered and Threatened Wildlife and Plants; Regulations for Designating Critical Habitat"), 86 Fed. Reg. 59346 (Oct. 27, 2021).

[10] U.S. Fish and Wildlife Service, 2018. Guidance on trigger for an incidental take permit under section 10 (a)(1)(B) of the Endangered Species Act where occupied habitat or potentially occupied habitat is being modified. Principal Deputy Director, Greg Sheehan. April 26, 2018.



administration as a necessary first step towards rebuilding and restoring a strong Endangered Species Act.

But we cannot forget that the pre-Trump regulations were codified in the Reagan administration, which weakened them from earlier regulations enacted shortly after passage of the Act. Rather than a hallmark of visionary conservation, the 1987 regulations *always* represented concessions to industry special interests. Thus, the extensive damage done during Trump's four years in office must be put in the context of a law that was already not being fully enforced. The damage from decades of neglect and cynical political decisions within the Services will continue to cause substantial harm to our natural heritage and worsen the extinction crisis until every rollback and insidious policy adopted not only during the Trump administration but also during the decades of complacency are reversed.

The massive challenge of confronting the extinction crisis will require the Services to not only fix the harmful acts of previous administrations that continue to do damage today—like restricting the consideration of the effects of greenhouse gas emissions and climate change on listed species—but to also push for new, ambitious regulatory safeguards that strengthen the implementation of the Act to address some of the long-standing issues that have plagued the wildlife agencies for decades, such as improper political interference, lackluster enforcement, and unnecessary bureaucratic delays.

Thus, in addition to repealing the Trump-era regulations, this petition requests bold regulatory improvements that align with the larger ambitions contained within the Act to recover species and their ecosystems, as well as the Act's mandate that extinction be halted "whatever the cost."[11] The proposed improvements, among other things, would: (1) restore scientific integrity and empower career scientists to make science-based decisions without fear of political reprisal; (2) create a more scientifically-defensible definition of what it means for a species to be fully recovered so that it plays a meaningful role in the ecosystems it lives in, as the Act originally envisioned; (3) give real meaning to the "significant portion of its range" provision to fulfill Congress's intent that species be protected before they are "threatened with worldwide extinction"[12]; (4) guarantee that federal agencies can no longer ignore the impacts of greenhouse gas emissions from their actions on climate change and climate-imperiled species; (5) strengthen protections for critical habitat so that it actually protects the key areas where species can live; (6) strengthen protections for foreign listed species; (7) require federal agencies to have proactive conservation programs in place for listed species harmed by their actions; (8) strengthen the regulations governing experimental populations and the reintroduction of threatened and endangered species; and (9) revamp the enhancement permitting program to only permit activities that themselves enhance the survival or propagation of species.

The United States can prevent future extinctions, but it must take swift action that matches the extent and scale of the problem. When Congress passed the Act almost 50 years ago with near unanimous support, it recognized that:

---

[11] *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 184 (1978).
[12] H. Rep. No. 93-412, at 2 (1973).

CENTER *for* BIOLOGICAL DIVERSITY

> [T]he pace of disappearance of species is accelerating. As we homogenize the habitats in which these plants and animals evolved, and as we increase the pressure for products that they are in a position to supply (usually unwillingly) we threaten their—and our own—genetic heritage. The value of this genetic heritage is, quite literally, incalculable.[13]

The Services have an opportunity to not only repair what has been harmed but to rebuild and restore the full power and effectiveness of our nation's strongest conservation law. By making these improvements, the Services can get back to fulfilling their core conservation mission so that our planet's natural heritage can be preserved for generations and centuries to come.

Thus, pursuant to Section 553(e) of the Administrative Procedure Act ("APA"),[14] the Center for Biological Diversity submits this petition to the Department of the Interior and the U.S. Fish and Wildlife Service, and to the Department of Commerce and the National Marine Fisheries Service, to strengthen the implementation of the Endangered Species Act to avert the global extinction crisis and curtail the ongoing loss of biodiversity both in the United States and around the world.[15]

## I.    Repeal All Trump-Era Regulations, Policies, and Guidance Documents Without Exception

The Trump administration systematically dismantled fundamental protections for our most endangered species and their habitats through a series of regulatory changes to section 4, which governs listing species, and section 7, which covers interagency consultation. These rollbacks undermine the scientific integrity of the Act by improperly injecting economic considerations into the listing process, sharply limiting protections for climate-threatened species, and eviscerating protections for critical habitat. Some of the more insidious rollbacks include sharply limiting when habitat can be designated as critical in the first place, redefining "environmental baseline" in a way that allows the Services to ignore the majority of harm caused by action agencies, and revising the definition of "effects of the action" to limit both the type and extent of effects of a proposed federal agency action that must be considered during the consultation process.

Below the radar, the FWS under the Trump administration also enacted numerous unilateral policies and informal guidance—most without any public comment or process—that were implemented by political appointees who in many cases were never confirmed by the U.S. Senate, as Trump deliberately left numerous positions throughout the federal government unoccupied for years. These efforts to further weaken the Act include (1) implementing a new prohibition on Service staff informing private parties that their actions on private land could result in take of listed species; (2) improperly forcing the Service to include unqualified political officials on Species Status Assessment teams to undermine the listing and recovery process; and

---

[13] *Id.* at 4.
[14] 5 U.S.C. § 553(e).
[15] The regulatory text for the proposed rule is provided below for consideration.

CENTER for BIOLOGICAL DIVERSITY

(3) withdrawing mitigation guidance designed to protect endangered species nationwide.

As a whole, the Trump rollbacks to the Act represented the largest attack on the law in the past 40 years. Thus, every regulation, guidance document and policy issued during the Trump administration must be rescinded in their entirety without exception.

## II.    Restore Scientific Integrity to the Listing and Consultation Process

When Congress amended the Endangered Species Act in the early 1980s to require that listing decisions be based "solely on the best scientific and commercial data available," it did so in response to efforts by the Reagan administration to inject short-term political and economic concerns into decisions of whether to list animals and plants. Despite a clear Congressional mandate to avoid economic considerations in the listing process, the Trump administration expressly allowed consideration of the economic impacts of listing in its section 4 regulations. While the Biden administration is expected to undue this blatantly illegal provision, the FWS's process for listing species has long allowed economic and political concerns to enter listing decisions in other ways. In particular, FWS's process for listing decisions involves multiple layers of bureaucracy and upwards of 20 people who only vet listing decisions based on political concerns. While expert biologists draft listing proposals, these proposals can be overturned at any point during this cumbersome review process by regional directors, the head of the listing division, the Assistant Director for Ecological Services, or high-level political appointees who often have no relevant, specific scientific background. In fact, it is frequently the case— especially with politically controversial species—that listing decisions are made in Washington, DC, including reversing the original listing recommendations of the Services' own scientists.[16]

The section 7 consultation process regarding agency actions has also been compromised by improper political interference. Similar to listing recommendations, expert biologists are responsible for completing Biological Opinions. However, if a FWS biologist is likely to make a jeopardy call, they are required to notify the chief of the Endangered Species Division within the regional office through the "Early Alert" process. The regional office then sends a memo to the Assistant Director of Ecological Services, who in turn notifies the Director—and possibly political appointees higher up in the Department of the Interior. If the same biologist makes a "no-jeopardy" decision, no additional review is needed. This asymmetrical approach to consultation has cultivated a system of intimidation which discourages career scientists from ever making jeopardy determinations for fear of political backlash. This pattern of stifling the decisions of lower-level staff persists to the present day.[17]

Thus, to restore scientific integrity to the Act and empower career scientists to make science-

---

[16] This was the case in the FWS decision to not protect the wolverine under the Endangered Species Act. In rejecting the agency's determination not to list the wolverine as arbitrary and capricious, the Montana District Court noted that the likely reason the wolverine was denied protection "can be found in the immense political pressure that was brought to bear on this issue, particularly by a handful of western states." *Defenders of Wildlife v. Jewell*, 176 F. Supp. 3d 975 (D. Mont. 2016).

[17] *See* Union of Concerned Scientists, Surveys of Scientists at Federal Agencies, *available at*: https://www.ucsusa.org/surveys-scientists-federal-agencies.



based decisions without fear of political reprisal, the petition proposes adding a requirement to the Act's implementing regulations that require public documentation and notice to the docket whenever an expert biologist's scientific conclusions are changed or altered by a supervising biologist, political official, or other Department employee. This notification requires including the name and qualifications of the employee making the change, as well as the scientific justification and citation to the literature supporting such change.

## III.    Create A Scientifically Defensible Definition of Recovery

Conserving threatened and endangered species is not limited to merely preventing their extinction. Under the Endangered Species Act, the conservation of listed species includes the much more ambitious goal of ensuring "listed species and their ecosystems are restored and their future is safeguarded to the point that protections under the ESA are no longer needed."[18] While the Act does not require a species to be restored to 100% of its lost historic range or its historic abundance, it does require that species be recovered to the point that they are meaningful components of the ecosystems they once inhabited.

Despite the paramount importance of recovery in the Endangered Species Act, the concept of "recovery" remains poorly defined. The current regulations only address recovery in the most basic manner, parroting the statutory text.[19]  The Services offer a slightly more robust definition of recovery in their Recovery Guidance—acknowledging that recovery includes the restoration of the ecosystems upon which threatened and endangered species depend and is not limited to reducing the risk of biological extinction below a certain threshold—but the Guidance offers no additional science-based criteria for defining recovery.

Thus, this petition proposes the following definition of what it should mean for a species to be fully recovered, including so that it plays a meaningful role in the ecosystems it lives in, as the Act originally envisioned:

> *Recovery* means the improvement in the status of a listed species such that—
>
> (1) the species is of sufficient abundance, measured by numbers of individuals, numbers of populations, range extent, and/or habitat availability, that it possesses the necessary representation, redundancy, and resiliency to ensure the species' long-term persistence, and to ensure that the species continues to perform its ecological role in each significant portion of its range; and
>
> (2) the species is no longer at risk of becoming endangered within the foreseeable

---

[18] Interim Endangered and Threatened Species Recovery Planning Guidance at 1.1-1 (June 2010)

[19] The regulations that guide the Section 7 consultation process state that recovery means "improvement in the status of listed species to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act." 50 C.F.R. § 402.02. The regulations that guide the process for the listing process state that a species may be delisted "on the basis of recovery only if the best scientific and commercial data available indicate that it is no longer endangered or threatened." 50 C.F.R. § 424.11(d)(2). Both of these regulations are legally accurate, but neither helps to explain what recovery means.



future in any significant portion of its range due to (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

In addition, this petition proposes a regulatory definition of "recovery plan," and clarifies that any recovery plan must include criteria that address each of the primary threats identified by the Services as affecting a species' recovery.[20] Further, for a species to be considered recovered, it must achieve the stated recovery criteria in its recovery plan.

## IV.    Define "Significant Portion of Its Range" to Prevent Extirpation

When Congress passed the Endangered Species Act, one of the most important additions was the ability to protect imperiled species before they reached the precipice of extinction globally. This change in approach to conservation provided the Services with a proactive tool to flexibly manage declining wildlife by protecting species "which are in trouble in any significant portion of their range, rather than threatened with worldwide extinction."[21] The inclusion of this authority made clear the Act's protections are to be afforded broadly to our nation's wildlife by allowing the Services to address the risks of a species being extirpated from a portion of its range, irrespective and independent of whether this loss in range would lead to the extinction of a species.

The Services have a dismal track record of developing a legally sound policy on the "significant portion of its range" language. Since early 2000s, the agencies have repeatedly tried and failed to develop legally defensible interpretations of the phrase. In each iteration, the Services developed myopic, semantically contorted interpretations of the law in an attempt to make the significant portion of its range language superfluous. Therefore, this petition proposes the following definition that is precautionary, based on the best available science, and consistent with the Act's stated policy goals:

> A portion of range will be considered significant based on the following criteria: it would increase the resiliency, redundancy or representation of the species, it ensures the conservation of the species in the variety of ecosystems in which it occurred or occurs, such that the species' role in those ecosystems is maintained or restored; for domestic species, it represents the last surviving occurrence of the species in the U.S., or furthers other objectives of the Act. Analysis of significant portion of range will consider both occupied and unoccupied range where a species could be recovered. Any portion of a species' range where it may be in danger of extinction or likely to become in danger of extinction in the foreseeable future will be analyzed for significance. Determination that a species is threatened throughout its range will not form a basis for considering whether it is endangered in a

---

[20] *See* Save the Bull Trout et al., v. Everson et al., CV-19-184-M-KLD (D. Mont. 2021).
[21] H.R. Rep. No. 93-412, at 2 (1973).



significant portion of range.

*Range* includes the current extent of occurrence of the species, the species' former extent of occurrence insofar as the species' former range extent still contains biologically suitable habitat or can be feasibly restored, and the projected extent of occurrence which will likely include biologically suitable habitat for the species within the foreseeable future.

## V.    Fully Integrate Climate Change into the Conservation and Recovery of Endangered Species

While a handful of climate-imperiled species like the polar bear and staghorn coral have been listed under the Endangered Species Act, the Services have refused — in both Democratic and Republican administrations — to consult on how federal agency actions that increase greenhouse gases harm those species and have tried to limit the impact that listing of climate-affected species has on major emitters.[22] As such, section 7 consultations represent a remarkably underutilized yet powerful tool for the federal government—which is responsible for a large portion of the country's overall emissions—to meaningfully address greenhouse gas emissions.

The Fourth National Climate Assessment warns that "climate change threatens many benefits that the natural environment provides to society," and that "extinctions and transformative impacts on some ecosystems" will occur "without significant reductions in global greenhouse gas emissions."[23] The best available science shows that anthropogenic climate change is causing widespread harm to life across the planet, disrupting species' distribution, timing of breeding and migration, physiology, vital rates, and genetics—in addition to increasing species extinction risk.[24] Climate change is already affecting 82% of key ecological processes that underpin ecosystem function and support basic human needs.[25] One million animal and plant species are now threatened with extinction, with climate change as a primary driver.[26]

Additionally, scientists can predict specific harms to individual species from the incremental emissions increases directly attributable to the federal agency actions, and can also assess the consequences of emissions for listed species' conservation and recovery. For example, the recovery plan for the polar bear predicts three different scenarios for polar bear populations under scenarios where emissions are abated early, emissions are abated later, and where emissions continue unabated.[27] Likewise, with respect to particular agency actions, scientists were able to calculate that the rollback of vehicle emissions standards by the Trump

[22] *See e.g. Appalachian Voices et al., v. Dept. of Interior et al.,* No. 20-2159 (4th Cir. 2022).
[23] U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States, Fourth National Climate Assessment, Vol. II* 42, 44 (2018), https://nca2018.globalchange.gov/.
[24] Rachel Warren et al., *Increasing impacts of climate change upon ecosystems with increasing global mean temperature rise*, 106 Climatic Change 141 (2011).
[25] Brett R. Scheffers, *The broad footprint of climate change from genes to biomes to people,* 354 Science 719 (2016).
[26] IPBES, Global Assessment Report on Biodiversity and Ecosystem Services (E.S. Brondízio et al eds., 2019), https://ipbes.net/news/Media-Release-Global-Assessment.
[27]  U.S. Fish and Wildlife Service, *Polar bear (*Ursus maritimus*) Conservation Management Plan, Final* (2016).



administration would have resulted in a sustained loss of more than 1,000 square miles of summer sea ice habitat for the polar bear and nearly one full additional day of ice-free conditions in Alaska and many other parts of the Arctic, which would reduce the length of the polar bear feeding season and lower reproductive success and survival.[28]

Completing climate consultations would ensure a "whole of government" approach to climate change and align with President Biden's stated goal to "organize and deploy the full capacity of agencies to combat the climate crisis."[29] Completing climate consultations would provide meaningful conservation benefits to species that are the most harmed by climate change, such as corals, Arctic species like polar bears, and species vulnerable to sea-level rise. Climate consultations would also help ensure better agency decision-making across the board in the face of the existential threat that climate change represents. Therefore, this petition proposes changes to the section 7 regulations that guarantee federal agencies can no longer ignore the impacts of their actions on climate change and climate-impacted species from their own emissions.

## VI.    Strengthen Protections for Critical Habitat

In passing the Endangered Species Act, Congress recognized the fundamental importance of protecting species' habitat, stating "if the protection of endangered species depends in large measure on the preservation of the species' habitat, then the ultimate effectiveness of the Endangered Species Act will depend on the designation of critical habitat."[30] Congress also recognized habitat destruction as the primary cause of species decline:

> Man can threaten the existence of species of plants and animals in any of a number of ways, by excessive use, by unrestricted trade, by pollution or by other destruction of their habitat or range. The most significant of those has proven also to be the most difficult to control: *the destruction of critical habitat*.[31]

Unfortunately, even the Services' regulations pre-Trump have underestimated the importance of critical habitat for species survival and recovery. In section 7, Congress prohibited federal agencies from taking actions that would result in the destruction **_or_** the adverse modification of critical habitat. Congress was clearly concerned with both the destruction of critical habitat as well as non-permanent, adverse modifications to critical habitat. Despite this fact, the Services have never given independent meaning to "destruction" as opposed to "adverse modification" of critical habitat, and instead have treated the two statutory prohibitions as equivalent. These two prohibitions are not equivalent.

The plain meaning of section 7(a)(2) is that federal agencies are prohibited from taking actions

---

[28] *See* Declarations of Shaye Wolf and Steven Amstrup, *Competitive Enterprise Inst. et al. v. National Highway Traffic Safety Admin. et al.,* Case No. 20-1145, Document No. 1880214 (filed Jan. 14, 2021) and Dirk Notz & Julienne Stroeve, *Observed Arctic sea ice loss directly follows anthropogenic CO2 emission*, 354, SCIENCE 747 (2016), https://science.sciencemag.org/content/354/6313/747/tab-pdf.
[29] *Tackling the Climate Crisis at Home and Abroad, Exec. Order No. 14,008*, 86 Fed. Reg. 7619 (Jan. 27, 2021)
[30] H.R. Rep. No. 94-887 (1976).
[31] H.R. Rep. 43-412 (1973) (emphasis added).



which result in *either* the destruction of critical habitat or the adverse modification of critical habitat. As the Supreme Court stated, "[T]his language admits of no exception."[32] Thus, this petition proposes two separate definitions that give independent meaning to both the prohibition on the "destruction" of critical habitat and the prohibition on the "adverse modification" of critical habitat. In addition to providing an independent definition for each term, we recommend that the Services eliminate the "appreciably diminish" threshold, and instead address and evaluate all non-trivial impacts to critical habitat during the consultation process at the smallest, biologically-relevant scale to further the recovery of listed species. Therefore, this petition proposes the following revised definitions:

> *Adverse modification* means any direct or indirect alteration that results in non-*de minimis* impacts to the value of a critical habitat unit for the survival or recovery of a listed species. Such alterations include, but are not limited to, alterations to the enumerated physical or biological features that were the basis for determining the habitat to be critical.

> *Destruction* means a direct or indirect alteration that permanently decreases the extent of critical habitat available for the survival or recovery of a listed species.

## VII. Strengthen Protections for Foreign-Listed Species by Restoring the Global Scope of Section 7 Interagency Consultations

One of the stated goals of the Endangered Species Act is to implement at least six international treaties to conserve endangered species, including the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere and the Convention on International Trade in Endangered Species of Wild Fauna and Flora.[33] The Act expressly states that achieving the goals and objectives of those treaties and conventions is the policy underlying the Act and contains provisions to aid in the recovery of species overseas, such as section 8's provision of funding, technical assistance, and investigations to help with other countries' recovery efforts. Thus, the Endangered Species Act envisions an integrated program of conservation both within and beyond U.S. borders.

Unfortunately, in 1986 one of the few changes made to the Act's implementing regulations was to end the practice of interagency consultation for federal agency action on U.S.-listed species that are found in other countries. This regulatory change was found to be inconsistent with the plain meaning of the Endangered Species Act and was struck down by the Eighth Circuit Court of Appeals.[34] But, in a sharply divided ruling, the Supreme Court reversed the Eighth Circuit on procedural grounds, and the unlawful 1986 regulation remains in place.[35]

Currently, there are over 600 foreign species listed under the Act. If a federal agency action occurs outside the United States and beyond the high seas, the current regulations do not require

---

[32] *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 173 (1978).
[33] 16 U.S.C. § 1531(a)(4) & (b).
[34] Defenders of Wildlife v. Lujan, 911 F.2d 117 (8th Cir. 1990).
[35] Defenders of Wildlife v. Lujan, 504 U.S. 555 (1992).



the action agency to engage in consultations with the Services *even if that action were to lead directly to the extinction of a foreign species listed under the Endangered Species Act.* Given the increasing number of major developments, from permit applications for proposed transboundary pipelines to the construction of border walls, and massive funding of international development projects, reinstating the original global geographic scope of the section 7 consultation requirement remains one of the most overdue changes to the Act's implementing regulations. This change would result in meaningful benefits for biodiversity, both within the United States and around the world. Therefore, this petition proposes restoring the original regulatory requirement that all federal agencies consult with the Services to ensure that any of their actions that may affect listed species beyond the borders of the United States will not jeopardize the existence of those species, as the plain language of the Endangered Species Act directs.

## VIII.  Require Federal Agencies to Develop Ambitious Proactive Conservation Programs for Species Harmed by Their Actions

Section 2(c) of the Endangered Species Act establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act."[36] While many of the Act's provisions work to effectuate the conservation goals of the statute, one of the greatest strengths of the Endangered Species Act is the interagency cooperation and consultation mandates provided in Section 7. Unfortunately, the affirmative recovery obligations under Section 7(a)(1) have largely been ignored and the consultation requirements under Section 7(a)(2) are under constant attack and have been whittled away over time. As noted above, the Services almost never conclude that a federal agency action must be stopped to avoid jeopardizing listed species. Rather, the overwhelming majority of biological opinions conclude that the action does not rise to the level of jeopardy but will result in incidental take. In these circumstances, the Services must provide an Incidental Take Statement ("ITS") and Reasonable and Prudent Measures ("RPMs") to *minimize* such take.[37] These mechanisms are the heart of the consultation process and what make the Endangered Species Act so successful. In fact, Congress explicitly recognized the importance of providing agencies with ways to minimize take when it amended the Act in 1982:

> in many cases in which a proposed action will not result in jeopardy, there may be minor modifications to the project which will minimize the effects on the species and which the action agency could easily and inexpensively adopt. We believe that providing such information to the action agency is important for the continued protection of endangered species and assists other federal agencies in fulfilling their obligations under section 7(a)(1) of the Act.[38]

Section 7(a)(1)—often referred to as the affirmative conservation duty—requires all federal agencies to "utilize their authorities … by carrying out programs for the conservation of

---

[36] 16 U.S.C. § 1531(c)(1).

[37]

[38] H.R. Rep. No. 97-567, at 44.

CENTER *for* BIOLOGICAL DIVERSITY

endangered and threatened species."[39] "Conservation" as used in the Act means "the use of all methods and procedures which are necessary to bring endangered species or threatened species to the point at which [the Act's protections] are no longer necessary."[40] In other words, the goal of conservation is species recovery. As the Supreme Court noted in *Tennessee Valley Authority v. Hill*, section 7(a)(1) is no less than "stringent, mandatory language,"[41] that "reveals an explicit congressional decision to require agencies to afford first priority to the declared national policy of saving endangered species."[42]

The value of Section 7(a)(1)'s affirmative mandate is that it adds endangered species conservation to the purposes of every single federal agency in a way that is accountable and meaningful. Yet despite the clear requirements of the law, agencies have all but ignored their obligation to conserve listed animals and plants. Thus, to ensure that federal agencies meet their obligations under section 7(a)(1) and ensure that their activities are consistent with the recovery of listed species, this petition proposes to require agencies to develop a section 7(a)(1) proactive conservation program for *each* species harmed by their proposed action as a condition to obtaining an ITS.[43] The Services will need to establish minimum requirements as to what those programs should include, but the goal and guiding principle of any such program must ultimately be the proactive, landscape-level conservation and recovery of the species.

## IX. Strengthen the Implementation and Use of Experimental Populations as a Key Conservation Tool for Species Recovery

Because of the overwhelming political pressure felt by career scientists at the Services, proactive efforts to conserve our most critically imperiled species have been inadequate. For example, the FWS has become extremely timid when it comes to embarking upon intensive conservation actions such as translocations under section 10(j) of the Act. Despite the authority existing since 1988, the FWS has *never* established an "essential" experimental population to enhance the conservation of any species, not even a species only in captivity. Given the extreme urgency of the extinction crisis, this failure is unacceptable.

One of the proposed changes would facilitate the designation of experimental populations notwithstanding whether a species' historical range is in dispute or when it is not clear whether a portion of uncontroverted historic range has actually been rendered unusable for the species. For example, the current regulations pose a hurdle to designating an experimental population area for the Mexican wolf in the southern Rocky Mountains, a region which biologists maintain is necessary for recovery but which is not considered part of its historic range. At the same time,

---

[39] 16 U.S.C. § 1536(a)(1).
[40] *Id.* at § 1532(3).
[41] TVA v. Hill, 437 U.S. at 183.
[42] *Id.* at 185.
[43] *See Sierra Club v. Glickman*, 156 F.3d 606, 618 (5th Cir. 1998) ("By imposing a duty on all federal agencies to use "all methods and procedures which are necessary to bring *any* endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary," 16 U.S.C. § 1532(2) (emphasis added), Congress was clearly concerned with the conservation of *each* endangered and threatened species. To read the command of § 7(a)(1) to mean that the agencies have only a generalized duty would ignore the plain language of the statute") (emphasis added).



the undisputed historic range for this subspecies in Mexico presently supports a small number of wolves and it is not clear whether sufficient habitat remains for a viable population.

A second needed change reflects the growing scientific understanding of the importance of connectivity of populations to ensure their persistence. Such connectivity does not have to equate to a joining of two populations, and can occur through the occasional movements of animals from one population to another, and their subsequent successful reproduction. Section 10(j) does not require the Service to isolate an experimental population from naturally occurring populations, and regulations should not encourage such management.

The existing experimental population of the Mexican wolf is by regulation confined to the experimental population area except to the south in Mexico, a provision serving to block connectivity and making it far more unlikely the infusion of needed genetic diversity from northern gray wolves into the genetically depauperate Mexican wolf population. However, while connectivity of populations is important, this factor alone should not deter the Service from pursuing recovery in areas where the experimental population would be isolated from a naturally occurring population. In these situations, the Service can use translocation to occasionally move individuals between populations to enable the genetic exchange to allow recovery of isolated populations.

## X.   Limit Section 10 Enhancement Permits to Activities that Actually Enhance the Survival or Propagation of Species

In passing the Endangered Species Act, Congress recognized that "economic growth" is a major factor in species extinction and made "overutilization for commercial" purposes one of the grounds for protecting species under the Act.[44] Thus, the Act is structured to curtail the commercial exploitation of imperiled species.[45]

Nevertheless, threatened and endangered species are routinely commodified under the Act through the FWS's issuance of "enhancement" permits. During the G.W. Bush administration, the agency proposed sweeping changes to ESA enhancement permitting.[46] The FWS proposed that the "net effect" of contributing money to an *in-situ* conservation program for the species, or an undefined "similar activity," would be accepted in exchange for a permit to engage in the otherwise unlawful activity – e.g., the import or take of a listed species.[47] Following significant public outcry, neither the proposed policy nor the proposed regulatory changes were ever officially adopted.

---

[44] 16 U.S.C. § 1533(a)(1); *see also* H.R. Rep. No. 412, Legislative History at 141 (the threat to species arises "principally" from "pollution, destruction of habitat and the pressures of trade"); *id.* at 145 (endangered species are "harried and hunted by those who would use them for their own advantage"); S. Rep. 93-307, 93d Cong., 1st Sess., Legislative History at 301 ("[t]he two major causes of extinction are hunting and destruction of natural habitat").
[45] See Valerius Geist, "How Markets in Wildlife Meat and Parts, and the Sale of Hunting Privileges, Jeopardize Wildlife Conservation," Conservation Biology, Vol. 2, Issue 1 at 16 (Mar. 1988) (U.S. wildlife conservation includes "the absence of market in the meat, parts, and products of [wildlife]").
[46] 68 Fed. Reg. 49,512 (Aug. 18, 2003); 68 Fed. Reg. 53,327 (September 10, 2003).
[47] Proposed Rule 17.22(a)(2)(ii); 68 Fed. Reg. at 53,333, col. 1.



However, the FWS has nonetheless implemented the "pay-to-play" concept using a "net benefit" standard to allow income generation alone to justify enhancement permits. In doing so, the FWS has essentially flipped the system. The safeguards that once resulted in the routine denial of permits to import or take listed species are gone and for decades the agency has been permitting activities that themselves do not enhance the survival or propagation of the species.[48] As explained by Congress, allowing for enhancement activities was intended "to *limit substantially the number or exemptions that may be granted under the act.*"[49]  Yet, the agency issues hundreds of enhancement permits every year.[50]

Section 10 provides that "[t]he Secretary may permit . . . *any act otherwise prohibited* by section 1538 of this title . . . to enhance the propagation or survival of the affected species."[51] Congress intended that the Act being permitted would itself actually enhance the species' survival. Coupled with Congress' recognition that the value of these species is "incalculable," and extinction is *irreparable*, the Endangered Species Act commands the "institutionalization of caution."[52] It is time the enhancement provisions are implemented in a cautionary manner by ensuring that the activity being permitted itself enhances the survival or propagation of the species.

Additionally, public input and scrutiny are paramount to Section 10's permitting scheme. Congress required public notice, the opportunity for comment, and that information related to the application be made "public as a matter of public record."[53] Thus, in revising the enhancement permitting regime, this petition seeks to ensure public notice and comment on threatened and endangered species Section 10 permits, not just those for endangered species. This will provide for public input and oversight of the permitting system and ensure that only the minimal permits envisioned by Congress are granted.

## XI.    Conclusion

Combating the global wildlife extinction crisis, stemming the loss of biodiversity, and restoring our natural heritage will require the Services to be bolder and more visionary than any other administration in history. There is no longer any time to waste. We have already lost hundreds of species to extinction in the United States, and now one million animal and plant species here and around the world are facing extinction in the coming decades if we fail to take immediate action. As Secretary Haaland recently stated:

---

[48] Both the statutory language and the legislative history make clear the narrow intent Congress has in crafting the enhancement provision in Section 10. *See, e.g.*, H. Rep. No. 412, 93d Cong., 1st Sess. 17 (July 27, 1973), reprinted in "A Legislative History of the Endangered Species Act of 1973" ("Legislative History"), 97th Cong., 2d Sess. (February 1982) at 156 (Congress explained that: "[a]ny such activities to encourage propagation or survival may take place in captivity, in a controlled habitat or even in an uncontrolled habitat so long as this is found to provide the most practicable and realistic opportunity to encourage the development of the species concerned.").
[49] 97th Cong., 2d Sess. at 156 (emphasis added).
[50] Our tracking of ESA enhancement permits issues for trophy imports of threatened and endangered species alone demonstrates that the Service issues hundreds of permits each year for species such as leopards, elephants, and lions.
[51] 16 U.S.C. § 1539(a) (emphasis added).
[52] House Report, Legislative History at 143-44.
[53] 16 U.S.C. § 1539(c).


CENTER for BIOLOGICAL DIVERSITY

"The specifics for each of the species demise' vary, but the story arc is essentially the same. Humans altered their habitat in a significant way, and we couldn't or didn't do enough to ultimately change the trajectory before it was too late. But this moment, as sobering as it is, can serve as a wakeup call. Our children and grandchildren will not know the earth as we do unless we change the status quo. We've got to do better by this planet, and we need to do it now."

The actions we take today will affect whether future generations live in a world where polar bears and monarch butterflies still exist, or one where they can only be found in children's books. Conserving our planet's natural heritage is a monumental challenge, but by adopting the recommendations outlined in this petition to strengthen the Endangered Species Act, the Services can make meaningful strides towards halting the extinction crisis and saving life on earth.

In accordance with the APA, we request that the Services expeditiously respond to this Petition.

Dated: March 8, 2022                    Respectfully submitted,

                                        Stephanie Kurose
                                        Senior Endangered Species Policy Specialist
                                        Center for Biological Diversity
                                        (202) 849-8395
                                        skurose@biologicaldiversity.org


## PROPOSED REGULATORY LANGUAGE

The following proposed regulatory text amends Title 50 of the Code of Federal Regulations.

### A.    Reallocation of Species to the National Marine Fisheries Service

§ 17.2. Scope of Regulations

(b) The National Marine Fisheries Service shall have exclusive jurisdiction over the following species:
    (1)  All marine species of fish, including all anadromous species of salmonid, sturgeon, and steelhead. Additionally, a marine species of fish includes those that inhabits any ocean environment, coastal marshes, estuaries or mangroves.
    (2) All marine aquatic invertebrates, including all corals..
    (3) All species of sea turtle.
    (4) All marine plants.

The U.S. Fish and Wildlife Service shall have exclusive jurisdiction over all remaining species under the Endangered Species Act. No later than 12 months following the finalization of this regulation, all jurisdiction of any such species currently maintained by the U.S. Fish and Wildlife


CENTER *for* BIOLOGICAL DIVERSITY

Service shall be transferred to the National Marine Fisheries Service to conform with the jurisdictional delineation set forth in this subpart.

**B.      Restoring the Blanket 4(d) Rule for FWS and Adoption of the Blanket 4(d) Rule for NMFS**

§ 17.31. Prohibitions

(a) Except as provided in subpart A of this part, or in a permit issued under this subpart, all of the provisions of §17.21 shall apply to threatened wildlife except § 17.21(c)(5).

§ 222.301. General Requirements
…
(b) No person shall take, import, export or engage in any other prohibited activity involving any species of fish or wildlife under the jurisdiction of the Secretary of Commerce that has been determined to be endangered under the Act, or that has been determined to be threatened, unless the Secretary has promulgated species-specific rules pursuant to Section 4(d) of the Act, without a valid permit issued pursuant to these regulations. The permit shall entitle the person to whom it is issued to engage in the activity specified in the permit, subject to the limitations of the Act and the regulations in parts 222, 223, and 224 of this chapter, for the period stated on the permit, unless sooner modified, suspended or revoked.

(c) Whenever a species-specific rule in subpart B of part 223 applies to a threatened species, none of the provisions of paragraph (b) of this section will apply. The species-specific rule will contain all the applicable prohibitions and exceptions.

**C.      Section 4 Listing and Critical Habitat Designation**

§ 424.02. Definitions
…
*Endangered Species.* Any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to humans. A species can be considered endangered even if it is not currently on the brink of extinction or at risk of extinction globally.

*Geographical area occupied by the species.* An area that may generally be delineated around species' occurrences, as determined by the Secretary (*i.e.,* range). Such areas may include those areas currently or historically used throughout all or part of the species' life cycle, even if not used on a regular basis (e.g., migratory corridors, seasonal habitats, and habitats used periodically, but not solely by vagrant individuals), as well as areas species may need in the future to carry out all or part of the species' life cycle.
…
*Line biologist(s).* The primary biologist(s) responsible for assessing the conservation status of a species for a determination under Section 4 of the Act, or that conducts research or collects data


CENTER *for* BIOLOGICAL DIVERSITY

on the relevant plant or animal species.

*Physical or biological features essential to the conservation of the species.* The features that support the life-history needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features. A feature may be a single habitat characteristic, or a more complex combination of habitat characteristics. Features may include habitat characteristics that support ephemeral or dynamic habitat conditions. Features may also be expressed in terms relating to principles of conservation biology, such as patch size, distribution distances, and connectivity.

…

*Recovery.* The improvement in the status of a listed species such that—

(1) the species is of sufficient abundance, measured by numbers of individuals, numbers of populations, range extent, and habitat availability, that it possesses the necessary representation, redundancy, and resiliency to ensure the species' long-term persistence, and to ensure that the species continues to perform its ecological role in each significant portion of its range; and

(2) the species is no longer at risk of becoming endangered within the foreseeable future in any significant portion of its range due to (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

*Recovery plan.* A plan that is used to determine recovery efforts for a threatened or endangered species or for an ecosystem upon which a threatened or endangered species relies. A recovery plan shall include criteria that address each of the primary threats identified by the Services as affecting a species' recovery.

*Significant Portion of its Range*. (1) A portion of range will be considered significant based on the following criteria: it would increase the resiliency, redundancy or representation of the species, it ensures the conservation of the species in the variety of ecosystems in which it occurred or occurs, such that the species' role in those ecosystems is maintained or restored; for domestic species it represents the last surviving occurrence of the species in the U.S., or furthers other objectives of the Act. Analysis of significant portion of range will consider both occupied and unoccupied range where a species could be recovered. Any portion of a species' range where it may be in danger of extinction or likely to become in danger of extinction in the foreseeable future will be analyzed for significance. Determination that a species is threatened throughout its range will not form a basis for considering whether it is endangered in a significant portion of range.

(2) *Range* includes the current extent of occurrence of the species, the species' former extent of occurrence insofar as the species' former range extent still contains biologically suitable habitat or can be feasibly restored, and the projected extent of occurrence which will likely include biologically suitable habitat for the species within the foreseeable future.

…

17



CENTER *for* BIOLOGICAL DIVERSITY

*Threatened species.* Any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. A species could be considered threatened even if its population is currently stable.

<u>§ 424.11. Factors for listing, delisting, or reclassifying species</u>
…

(d) The Service shall, to the maximum extent practicable, first propose to reclassify an endangered species as threatened, on the basis of the best scientific and commercial data available after conducting a review of the species' status, prior to proposing an endangered species for delisting.

(e) The factors considered in delisting a species are those in paragraph (c) of this section as they relate to the definitions of endangered or threatened species. Such removal must be supported by the best scientific and commercial data available to the Secretary after conducting a review of the status of the species. A species may be delisted only if such data substantiate that it is neither endangered nor threatened for one or more of the following reasons:

   (1) Extinction. Unless all individuals of the listed species had been previously identified and located, and were later found to be extirpated from their previous range, a sufficient period of time must be allowed before delisting to indicate clearly that the species is extinct.

   (2) Recovery. The principal goal of the U.S. Fish and Wildlife Service and the National Marine Fisheries Service is to return listed species to a point at which protection under the Act is no longer required. A species may be delisted on the basis of recovery only if the best scientific and commercial data available indicate that it is no longer endangered or threatened and it has achieved the stated recovery criteria in its recovery plan.

   (3) Original data for classification in error. Subsequent investigations may show that the best scientific or commercial data available when the species was listed, or the interpretation of such data, were in error.

(f) The line biologist shall be primarily responsible for making scientific recommendations pursuant to this section regarding the conservation status of a species. If the line biologist's scientific conclusions are changed, modified or altered by a supervising biologist, appointed political official, or other Department of Interior employee, each change or alteration must be documented and posted to the federal docket, and shall include: (1) the name of the employee; (2) their qualifications and expertise regarding the specific species at issue; and (3) the scientific justification or information that supports such change to the line biologist's original conclusion.
…

<u>§424.12. Criteria for designating critical habitat</u>

(a)(1) A designation of critical habitat may not be prudent when the following situation exists:
   (i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species.



CENTER for BIOLOGICAL DIVERSITY

(2) Designation of critical habitat is not determinable when one or both of the following situations exist:

(i) Data sufficient to perform required analyses are lacking; or

(ii) The biological needs of the species are not sufficiently well known to identify any area that meets the definition of "critical habitat."

(3) If upon publication of a final rule listing a species the Secretary determines that designation of critical habitat is not then determinable, the Secretary shall have not more than one additional year to publish a final regulation, based on such data as may be available at that time, designating, to the maximum extend determinable, such habitat.

…

(b)(2) The Secretary will identify, at a scale determined by the Secretary to be appropriate, specific areas outside the geographical area occupied by the species to be considered for designation as critical habitat that are essential for its conservation considering the life history, status, and conservation needs of the species based on the best available scientific data.

…

(g) The Secretary may, if warranted, designate critical habitat within foreign countries or in other areas outside of the jurisdiction of the United States.

…

§ 424.14. Petitions

(a) *Ability to petition*. Any interested person may submit a written petition to the Services requesting that one of the actions described in § 424.10 be taken for a species.

(b) *Requirements for petitions*. A petition must clearly identify itself as such, be dated, and contain the following information:…

§ 424.19. Impact analysis and exclusions from critical habitat

(c) The Secretary has discretion to exclude any particular area from the critical habitat upon a determination that the benefits of such exclusion outweigh the benefits of specifying the particular area as part of the critical habitat. The Secretary, however, shall not exclude any particular area if, based on the best scientific and commercial data available, the Secretary determines that the failure to designate that area as critical habitat will result in the extinction of the species concerned.

**D.    Section 7 Interagency Consultations**

§ 402.01. Scope

(a) This part interprets and implements sections 7(a)–(d) [16 U.S.C. 1536(a)–(d)] of the Endangered Species Act of 1973, as amended (''Act''). Section 7(a) grants authority to and imposes requirements upon Federal agencies regarding endangered or threatened species of fish,

 CENTER *for* BIOLOGICAL DIVERSITY

wildlife, or plants (''listed species'') and habitat of such species that has been designated as critical (''critical habitat''). Section 7(a)(1) of the Act directs Federal agencies, in consultation with and with the assistance of the Secretary of the Interior or of Commerce, as appropriate, to utilize their authorities to further the purposes of the Act by carrying out conservation programs for listed species. Such affirmative conservation programs must comply with applicable permit requirements (50 CFR parts 17, 220, 222, and 227) for listed species and should be coordinated with the appropriate Secretary. Section 7(a)(2) of the Act requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States, in foreign nations, or upon the high seas, is not likely to jeopardize the continued existence of any listed species or results in the destruction or adverse modification of critical habitat. Section 7(a)(3) of the Act authorizes a prospective permit or license applicant to request the issuing Federal agency to enter into early consultation with the Service on a proposed action to determine whether such action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Section 7(a)(4) of the Act requires Federal agencies to confer with the Secretary on any action that is likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat. Section 7(b) of the Act requires the Secretary, after the conclusion of early or formal consultation, to issue a written statement setting forth the Secretary's opinion detailing how the agency action affects listed species or critical habitat Biological assessments are required under section 7(c) of the Act if listed species or critical habitat may be present in the area affected by any major construction activity as defined in §404.02. Section 7(d) of the Act prohibits Federal agencies and applicants from making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives which would avoid jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. Section 7(e)– (o)(1) of the Act provide procedures for granting exemptions from the requirements of section 7(a)(2). Regulations governing the submission of exemption applications are found at 50 CFR part 451, and regulations governing the exemption process are found at 50 CFR parts 450, 452, and 453.

§ 402.02. Definitions

*Action* means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States, in foreign nations, or upon the high seas. Examples include, but are not limited to:

    (a) actions intended to conserve listed species or their habitat;
    (b) the promulgation of regulations;
    (c) the granting of licenses, contracts, leases, easements, rights-of way, permits, or grants-in-aid; or
    (d) actions directly or indirectly causing modifications to the land, water, or air, or climate.

*Action area* means all areas to be affected directly or indirectly by the Federal action, including spatially distant or remote areas, and not merely the immediate area involved in the action.

*Adverse modification* means any direct or indirect alteration that results in non-*de minimis*

CENTER *for* BIOLOGICAL DIVERSITY

impacts to the value of a critical habitat unit for the survival or recovery of a listed species. alterations include, but are not limited to, alterations to the enumerated physical or biological features that were the basis for determining the habitat to be critical.

…

*Destruction* means a direct or indirect alteration that permanently decreases the extent of critical habitat available for the survival or recovery of a listed species.

…

*Effects of the action* refers to the direct, indirect, and cumulative effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. Indirect effects are those that are caused by the proposed action and are later in time or spatially distant or remote, but still are foreseeable. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

*Endangered Species.* Any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to man. A species can be considered endangered even if it is not currently on the brink of extinction or at risk of extinction globally.

*Environmental baseline refers to* the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The environmental baseline does not include any past or completed federal actions that have not undergone and completed section 7 consultation.

…

*Line biologist(s)* means the primary biologist(s) responsible for preparing a biological opinion or habitat conservation plan or who conducts research or collects data on any plant or animal species.

…

*Recovery* means improvement in the status of listed species such that:

(1) the species is of sufficient abundance, measured by numbers of individuals, numbers of populations, range extent, and habitat availability, that it possesses the necessary representation, redundancy, and resiliency to ensure the species' long-term persistence, and to ensure that the species continues to perform its ecological role in each significant portion of its range; and

(2) the species is no longer at risk of becoming endangered within the foreseeable future in any significant portion of its range due to (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

…

 CENTER *for* BIOLOGICAL DIVERSITY

*Threatened species.* Any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range. A species could be considered threatened even if its population trend is currently stable.

§ 402.03. Applicability

(a) Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control.

(b) All Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by establishing and carrying out programs for the conservation of any such endangered species and threatened species listed pursuant to section 4 of this Act where such agency in causing take of such species or expects to cause take of such species as a result of normal agency actions functions.

§ 402.04. Counterpart regulations

The consultation procedures set forth in this part may be superseded for a particular Federal agency by joint counterpart regulations among that agency, the Fish and Wildlife Service, and the National Marine Fisheries Service, provided that such counterpart regulations have undergone consultation pursuant to section 7(a)(2) of the Act and the completion of an Environmental Impact Statement pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. No counterpart regulations shall take effect prior to the completion of all legally required consultations and other compliance requirements. Such counterpart regulations shall be published in the FEDERAL REGISTER in proposed form and shall be subject to public comment for at least 60 days before final rules are published.

§ 402.13. Informal consultation

(c) If during informal consultation it is determined by the Federal agency, with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary.
   (1) A written request for concurrence with a Federal agency's not likely to adversely affect determination shall include information similar to the types of information described for formal consultation at § 402.14(c)(1) sufficient for the Service to determine if it concurs.

§ 402.14. Formal consultation
…
(c) *Initiation of formal consultation.* (1) A written request to initiate formal consultation shall be submitted to the Director and shall include:
  i.  A description of the action to be considered;
  ii.  A description of the specific area that may be affected by the action;
  iii.  A description of any listed species or critical habitat that may be affected by the action;
  iv.  A description of the manner in which the action may affect any listed species or critical habitat and an analysis of any cumulative effects;

 CENTER *for* BIOLOGICAL DIVERSITY

    v.   Relevant reports, including any environmental impact statement, environmental assessment, or biological assessment prepared; and

   vi.   Any other relevant available information on the action, the affected listed species, or critical habitat. Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with §402.12. Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area or a segment of a comprehensive plan. This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole.

…

(g) *Service responsibilities.* Service responsibilities during formal consultation are as follows:

    …

    (4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.…

    (8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation.

(h) *Biological opinions.*

…

    (3)(i) The line biologist shall be primarily responsible for making scientific recommendations pursuant to this section regarding whether a Federal agency action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat, as well as the conditions for issuing a permit for incidental take if warranted.

    (ii) If the line biologist's scientific conclusions are changed or altered by a supervising biologist, political official, or other Department of the Interior or Department of Commerce employee, each change or alteration must be documented and posted to the federal docket, and shall include: (1) the name of the employee; (2) their qualifications and expertise regarding the specific species at issue; and (3) the scientific justification or information that supports such change to the line biologist's original conclusion.

(i) *Incidental take.*

…

    (7) No Federal agency triggering consultation under this section for a threatened or endangered species shall receive an incidental take statement unless that agency has in place a section 7(a)(1) conservation program for the threatened or endangered species covered by such statement.

…

§ 402.15. Responsibilities of Federal agency following issuance of a biological opinion

…

 CENTER *for* BIOLOGICAL DIVERSITY

(c) If the Federal agency does not adopt one of the Service's proposed reasonable and prudent alternatives for any reason, and no comparable alternative is implemented, then the Service shall not issue an incidental take statement to the Federal agency.

(d) If the Federal agency determines that it cannot comply with the requirements of section 7(a)(2) after consultation with the Service, it may apply for an exemption. Procedures for exemption applications by Federal agencies and others are found in 50 CFR part 451.

Permits for Incidental Taking of Species

§ 17.22 Permits for scientific purposes, enhancement of propagation or survival, or for incidental taking.
…
(b)(1) Application requirements for permits for incidental taking.
…
(2) Issuance Criteria.

(i) Upon receiving an application completed in accordance with paragraph (b)(1) of this section, the Director will decide whether or not a permit should be issued. The Director shall consider the general issuance criteria in § 13.21(b) of this subchapter, except for § 13.21(b)(4), and shall issue the permit if he or she finds that:
…
(C) The plan confers a net benefit on species sought to be covered by the permit;
(D) The applicant will ensure that adequate funding for the conservation plan and procedures to deal with unforeseen circumstances will be provided;
(E) The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild;
(F) The measures, if any, required under paragraph (b)(1)(iii)(D) of this section will be met; and
(G) He or she has received such other assurances as he or she may require that the plan will be implemented.
….
(3) Permit conditions. In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this paragraph shall contain such terms and conditions as the Director deems necessary or appropriate to carry out the purposes of the permit and the conservation plan. Such terms and conditions shall include mandatory self-reporting by the permittee for each occurrence of incidental take of a covered species, as well as any additional monitoring and reporting requirements deemed necessary for determining whether such terms and conditions are being complied with. The Director shall rely upon existing reporting requirements to the maximum extent practicable.
…
(5) Changed or unforeseen circumstances.
If additional conservation and mitigation measures are deemed necessary to respond to changed or unforeseen circumstances, the Director may require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation

CENTER *for* BIOLOGICAL DIVERSITY

plan.

…

(8) Criteria for revocation. The Director shall revoke a permit issued under this paragraph if he or she finds that the permittee is not complying with the terms and conditions of the permit.

§ 222.307 Permits for incidental taking of species

…

(c) Issuance criteria.

…

(2) To issue the permit, the Assistant Administrator must find that –

(i) The taking will be incidental;
(ii) The applicant will, to the maximum extent practicable, monitor, minimize, and mitigate the impacts of such taking;
(iii) The plan confers a net benefit on species sought to be covered by the permit
(iv) The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild;
(v) The applicant has amended the conservation plan to include any measures (not originally proposed by the applicant) that the Assistant Administrator determines are necessary or appropriate; and
(vi) There are adequate assurances that the conservation plan will be funded and implemented, including any measures required by the Assistant Administrator.

(d) Permit conditions. In addition to the general conditions set forth in this part, every permit issued under this section will contain such terms and conditions as the Assistant Administrator deems necessary and appropriate, including, but not limited to the following:

(1) Reporting requirements or rights of inspection for determining whether the terms and conditions are being complied with;
(2) The species and number of animals covered;
(3) The authorized method of taking;
(4) Mandatory self-reporting by the permittee for each occurrence of incidental take of a covered species;
(5) The procedures to be used to handle or dispose of any animals taken; and
(6) The payment of an adequate fee to the National Marine Fisheries Service to process the application.

…

(g) Changed or unforeseen circumstances.

If additional conservation and mitigation measures are deemed necessary to respond to changed or unforeseen circumstances, NMFS may require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan.

…

(i) Criteria for revocation. The Director shall revoke a permit issued under this paragraph if he or

CENTER *for* BIOLOGICAL DIVERSITY

she finds that the permittee is not complying with the terms and conditions of the permit.

## E.    U.S. Fish and Wildlife Service Enhancement Permits

§ 17.3. Definitions

…

*Enhance the propagation or survival* means the activity sought to be permitted itself improves or increases the propagation or survival of the species. When used in reference to wildlife in captivity, enhance the propagation or survival includes but is not limited to the following activities when it can be shown that such activities would not be detrimental to the survival of wild or captive populations of the affected species: . . .

…

§ 17.22. Permits for scientific purposes, enhancement of propagation or survival, or for incidental taking

…

(a)(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a)(1) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in §13.21(b) of this subchapter, the following factors:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;
(ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;
(iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;
(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit or otherwise improves or increases the propagation or survival of the species;
(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and
(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

In making this decision, the activity being permitted must itself improve or increase the propagation or survival of the species. Generation of fees, payments, or monetary contributions cannot justify an enhancement finding.

§ 17.32 Permits—general.

Upon receipt of a complete application the Director may issue a permit for any activity otherwise prohibited with regard to threatened wildlife. Such permit shall be governed by the provisions of this section unless a special rule applicable to the wildlife, appearing in §§17.40 to 17.48, of this part provides otherwise. Permits issued under this section must be for one of the following purposes: Scientific purposes, or the enhancement of propagation or survival, or economic

26



CENTER for BIOLOGICAL DIVERSITY

hardship, or zoological exhibition, or educational purposes, or incidental taking, or special purposes consistent with the purposes of the Act. Such permits may authorize a single transaction, a series of transactions, or a number of activities over a specific period of time. The Director shall publish notice in the FEDERAL REGISTER of each application for a permit that is made under this section. Each notice shall invite the submission from interested parties, within 30 days after the date of the notice, of written data, views, or arguments with respect to the application. The 30-day period may be waived by the Director in an emergency situation where the life or health of an endangered animal is threatened and no reasonable alternative is available to the applicant. Notice of any such waiver shall be published in the FEDERAL REGISTER within 10 days following issuance of the permit.

…

(a)(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a)(1) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in §13.21(b) of this subchapter, the following factors:

    (i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;
    (ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;
    (iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;
    (iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;
    (v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and
    (vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

In making this decision, the activity being permitted must itself improve or increase the propagation or survival of the species. Generation of fees, payments, or monetary contributions cannot justify an enhancement finding.

**F.    Strengthening the Regulations Governing Experimental Populations and Reintroduction of Threatened and Endangered Species**

§ 17.81. Listing

(a) The Secretary may designate as an experimental population a population of endangered or threatened species that has been or will be released into suitable habitat outside the species' current range subject to the further conditions specified in this section; *provided,* that all designations of experimental populations must proceed by regulation adopted in accordance with 5 U.S.C. 553 and the requirements of this subpart.

…

(c) Any regulation promulgated under paragraph (a) of this section shall provide:

 CENTER *for* BIOLOGICAL DIVERSITY

…
    (3) Management restrictions, protective measures, or other special management concerns of that population

…

(d) The Fish and Wildlife Service shall consult with appropriate State fish and wildlife agencies, local governmental entities, affected Federal agencies, and affected private landowners in developing and implementing experimental population rules. When appropriate, a public meeting will be conducted with interested members of the public

…

## G.    Regulations to Repeal in their Entirety

§ 17.90 Considerations of Impacts and Exclusions From Critical Habitat

§ 402.17 Other provisions

§§ 402.30 – 402.34 Counterpart Regulations for Implementing the National Fire Plan

§§ 402.40 – 402.48 Counterpart Regulations Governing Actions by the U.S. Environmental Protection Agency Under the Federal Insecticide, Fungicide and Rodenticide Act

CENTER *for* BIOLOGICAL DIVERSITY

## APPENDIX

**A.    Reallocation of Species to the National Marine Fisheries Service**

**§ 17.02. Scope of regulations.**

…

(b) The National Marine Fisheries Service shall have exclusive jurisdiction over the following species:

(2)  All marine species of fish, including all anadromous species of salmonid, sturgeon, and steelhead. Additionally, a marine species of fish includes those that inhabits any ocean environment, coastal marshes, estuaries or mangroves.

(3) All marine aquatic invertebrates, including all corals and sea plants.

(4) All species of sea turtle.

The U.S. Fish and Wildlife Service shall have exclusive jurisdiction over all remaining species under the Endangered Species Act. No later than 12 months following the finalization of this regulation, all jurisdiction of any such species currently maintained by the U.S. Fish and Wildlife Service shall be transferred to the National Marine Fisheries Service to conform with the jurisdictional delineation set forth in this subpart.

**B.    Restoring the Blanket 4(d) Rule for FWS and Adoption of the Blanket 4(d) Rule for NMFS**

**§ 17.31    Prohibitions.**

(a) Except as provided in §§17.4 through 17.8 subpart A of this part, or in a permit issued under this subpart, all of the provisions of §17.21, except §17.21(c)(5), shall apply to threatened species of wildlife, that were added to the List of Endangered and Threatened Wildlife in §17.11(h) on or prior to September 26, 2019, unless the Secretary has promulgated species-specific provisions (see paragraph (c) of this section). except § 17.21(c)(5).

…

**§ 222.301    General requirements.**

(b) No person shall take, import, export or engage in any other prohibited activity involving any species of fish or wildlife under the jurisdiction of the Secretary of Commerce that has been determined to be endangered under the Act, or that has been determined to be threatened, for which the prohibitions of section 9(a)(1) of the Act have been applied by regulation, unless the Secretary has promulgated species-specific rules pursuant to Section 4(d) of the Act, without a valid permit issued pursuant to these regulations. The permit shall entitle the person to whom it is issued to engage in the activity specified in the permit, subject to the limitations of the Act and the regulations in parts 222, 223, and 224 of this chapter, for the period stated on the permit, unless sooner modified, suspended or revoked.

(c) Whenever a species-specific rule in subpart B of part 223 applies to a threatened species,

none of the provisions of paragraph (b) of this section will apply. The species-specific rule will contain all the applicable prohibitions and exceptions.

**C.     Section 4 Listing and Critical Habitat Designation**

**§ 424.02   Definitions.**

…

*Endangered Species.* Any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to humans. A species can be considered endangered even if it is not currently on the brink of extinction or at risk of extinction globally.

*Geographical area occupied by the species.* An area that may generally be delineated around species' occurrences, as determined by the Secretary (*i.e.,* range). Such areas may include those areas currently or historically used throughout all or part of the species' life cycle, even if not used on a regular basis (e.g., migratory corridors, seasonal habitats, and habitats used periodically, but not solely by vagrant individuals)., as well as areas species may need in the future to carry out all or part of the species' life cycle.

*Habitat.* For the purposes of designating critical habitat only, habitat is the abiotic and biotic setting that currently or periodically contains the resources and conditions necessary to support one or more life processes of a species.

…

*Line biologist(s).* The primary biologist(s) responsible for assessing the conservation status of a species for a determination under Section 4 of the Act, or that conducts research or collects data on the relevant plant or animal species.

…

*Physical or biological features essential to the conservation of the species.* The features that occur in specific areas and that are essential to support the life-history needs of the species, including but not limited to, water characteristics, soil type, geological features, sites, prey, vegetation, symbiotic species, or other features. A feature may be a single habitat characteristic, or a more complex combination of habitat characteristics. Features may include habitat characteristics that support ephemeral or dynamic habitat conditions. Features may also be expressed in terms relating to principles of conservation biology, such as patch size, distribution distances, and connectivity.

…

*Recovery.* The improvement in the status of a listed species such that—

(1) the species is of sufficient abundance, measured by numbers of individuals, numbers of populations, range extent, and habitat availability, that it possesses the necessary representation, redundancy, and resiliency to ensure the species' long-term persistence, and to ensure that the species continues to perform its ecological role in each significant portion of its range; and

(2) the species is no longer at risk of becoming endangered within the foreseeable future in any

 CENTER *for* BIOLOGICAL DIVERSITY

significant portion of its range due to (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.

*Recovery plan.* A plan that is used to determine recovery efforts for a threatened or endangered species or for an ecosystem upon which a threatened or endangered species relies. A recovery plan shall include criteria that address each of the primary threats identified by the Services as affecting a species' recovery.

*Significant Portion of its Range*. (1) A portion of range will be considered significant based on the following criteria: it would increase the resiliency, redundancy or representation of the species, it ensures the conservation of the species in the variety of ecosystems in which it occurred or occurs, such that the species' role in those ecosystems is maintained or restored; for domestic species it represents the last surviving occurrence of the species in the U.S., or furthers other objectives of the Act. Analysis of significant portion of range will consider both occupied and unoccupied range where a species could be recovered. Any portion of a species' range where it may be in danger of extinction or likely to become in danger of extinction in the foreseeable future will be analyzed for significance. Determination that a species is threatened throughout its range will not form a basis for considering whether it is endangered in a significant portion of range.

(2) *Range* includes the current extent of occurrence of the species, the species' former extent of occurrence insofar as the species' former range extent still contains biologically suitable habitat or can be feasibly restored, and the projected extent of occurrence which will likely include biologically suitable habitat for the species within the foreseeable future.

…

*Threatened species.* Any species which is likely to become endangered within the foreseeable future throughout all or a significant portion of its range. A species could be considered threatened even if its population trend is currently stable.

## § 424.11  Factors for listing, delisting, or reclassifying species.

...

(d) The Service shall, to the maximum extent practicable, first propose to reclassify an endangered species as threatened, on the basis of the best scientific and commercial data available after conducting a review of the species' status, prior to proposing an endangered species for delisting.

~~(d) In determining whether a species is a threatened species, the Services must analyze whether the species is likely to become an endangered species within the foreseeable future. The term foreseeable future extends only so far into the future as the Services can reasonably determine that both the future threats and the species' responses to those threats are likely. The Services will describe the foreseeable future on a case-by-case basis, using the best available data and taking into account considerations such as the species' life-history characteristics, threat-projection timeframes, and environmental variability. The Services need not identify the foreseeable future~~

 CENTER *for* BIOLOGICAL DIVERSITY

in terms of a specific period of time.

~~(e) The Secretary shall delist a species if the Secretary finds that, after conducting a status review based on the best scientific and commercial data available:~~
~~(1) The species is extinct;~~
~~(2) The species does not meet the definition of an endangered species or a threatened species. In making such a determination, the Secretary shall consider the same factors and apply the same standards set forth in paragraph (c) of this section regarding listing and reclassification; or~~
~~(3) The listed entity does not meet the statutory definition of a species.~~

(e) The factors considered in delisting a species are those in paragraph (c) of this section as they relate to the definitions of endangered or threatened species. Such removal must be supported by the best scientific and commercial data available to the Secretary after conducting a review of the status of the species. A species may be delisted only if such data substantiate that it is neither endangered nor threatened for one or more of the following reasons:

(1) Extinction. Unless all individuals of the listed species had been previously identified and located, and were later found to be extirpated from their previous range, a sufficient period of time must be allowed before delisting to indicate clearly that the species is extinct.

(2) Recovery. The principal goal of the U.S. Fish and Wildlife Service and the National Marine Fisheries Service is to return listed species to a point at which protection under the Act is no longer required. A species may be delisted on the basis of recovery only if the best scientific and commercial data available indicate that it is no longer endangered or threatened and it has achieved the stated recovery criteria in its recovery plan.

(3) Original data for classification in error. Subsequent investigations may show that the best scientific or commercial data available when the species was listed, or the interpretation of such data, were in error.

(f) (1) The line biologist shall be primarily responsible for making scientific recommendations pursuant to this section regarding the conservation status of a species.

(2) If the line biologist's scientific conclusions are changed or altered by a supervising biologist, political official, or other Department of Interior employee, each change or alteration must be documented and posted to the federal docket, and shall include:
(i) the name of the employee;
(ii) their qualifications and expertise regarding the specific species at issue; and
(iii) the scientific justification or information that supports such change to the line biologist's original conclusion.

## § 424.12   Criteria for designating critical habitat.

…

(a) (1) ~~The Secretary may, but is not required to, determine that a designation would not be prudent in the following circumstances:~~ A designation of critical habitat ~~is~~ may not be prudent when ~~any of~~ the following situations exists:

CENTER for BIOLOGICAL DIVERSITY

(i) The species is threatened by taking or other human activity and identification of critical habitat can be expected to increase the degree of such threat to the species.; or

(ii) Such designation of critical habitat would not be beneficial to the species. In determining whether a designation would not be beneficial, the factors the Services may consider include but are not limited to: Whether the present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or whether any areas meet the definition of ''critical habitat.''

(ii) The present or threatened destruction, modification, or curtailment of a species' habitat or range is not a threat to the species, or threats to the species' habitat stem solely from causes that cannot be addressed through management actions resulting from consultations under section 7(a)(2) of the Act;

(iii) Areas within the jurisdiction of the United States provide no more than negligible conservation value, if any, for a species occurring primarily outside the jurisdiction of the United States;

(iv) No areas meet the definition of critical habitat; or

(v) The Secretary otherwise determines that designation of critical habitat would not be prudent based on the best scientific data available.

…

(3) If upon publication of a final rule listing a species the Secretary determines that designation of critical habitat is not then determinable, the Secretary shall have not more than one additional year to publish a final regulation, based on such data as may be available at that time, designating, to the maximum extend determinable, such habitat.

…

(b) (2) The Secretary will designate as critical habitat, at a scale determined by the Secretary to be appropriate, specific areas outside the geographical area occupied by the species only upon a determination that such areas are essential for the conservation of the species. When designating critical habitat, the Secretary will first evaluate areas occupied by the species. The Secretary will only consider unoccupied areas to be essential where a critical habitat designation limited to geographical areas occupied would be inadequate to ensure the conservation of the species. In addition, for an unoccupied area to be considered essential, the Secretary must determine that there is a reasonable certainty both that the area will contribute to the conservation of the species and that the area contains one or more of those physical or biological features essential to the conservation of the species.

(b) (2) The Secretary will identify, at a scale determined by the Secretary to be appropriate, specific areas outside the geographical area occupied by the species to be considered for designation as critical habitat that are essential for its conservation considering the life history, status, and conservation needs of the species based on the best available scientific data.

…

(g) The Secretary will not designate critical habitat within foreign countries or in other areas outside of the jurisdiction of the United States. The Secretary may, if warranted, designate critical habitat within foreign countries or in other areas outside of the jurisdiction of the United States.

…

§ 424.14   Petitions.

…

33



CENTER *for* BIOLOGICAL DIVERSITY

~~(b) *Notification of intent to file petition.* For a petition to list, delist, or reclassify a species, or for petitions to revise critical habitat, petitioners must provide notice to the State agency responsible for the management and conservation of fish, plant, or wildlife resources in each State where the species that is the subject of the petition occurs. This notification must be made at least 30 days prior to submission of the petition. This notification requirement shall not apply to any petition submitted pertaining to a species that does not occur within the United States.~~

…

§ 424.19   Impact analysis and exclusions from critical habitat.

…

(c) The Secretary has discretion to exclude any particular area from the critical habitat upon a determination that the benefits of such exclusion outweigh the benefits of specifying the particular area as part of the critical habitat. ~~In identifying those benefits, in addition to the mandatory consideration of impacts conducted pursuant to paragraph (b) of this section, the Secretary may assign the weight given to any benefits relevant to the designation of critical habitat.~~ The Secretary, however, ~~will~~ <u>shall</u> not exclude any particular area if, based on the best scientific and commercial data available, the Secretary determines that the failure to designate that area as critical habitat will result in the extinction of the species concerned.

**D.    Section 7 Interagency Consultation**

§ 402.01. Scope.

(a) This part interprets and implements sections 7(a)–(d) [16 U.S.C. 1536(a)–(d)] of the Endangered Species Act of 1973, as amended (''Act''). Section 7(a) grants authority to and imposes requirements upon Federal agencies regarding endangered or threatened species of fish, wildlife, or plants (''listed species'') and habitat of such species that has been designated as critical (''critical habitat''). Section 7(a)(1) of the Act directs Federal agencies, in consultation with and with the assistance of the Secretary of the Interior or of Commerce, as appropriate, to utilize their authorities to further the purposes of the Act by carrying out conservation programs for listed species. Such affirmative conservation programs must comply with applicable permit requirements (50 CFR parts 17, 220, 222, and 227) for listed species and should be coordinated with the appropriate Secretary. Section 7(a)(2) of the Act requires every Federal agency, in consultation with and with the assistance of the Secretary, to insure that any action it authorizes, funds, or carries out, in the United States, <u>in foreign nations,</u> or upon the high seas, is not likely to jeopardize the continued existence of any listed species or results in the destruction or adverse modification of critical habitat. Section 7(a)(3) of the Act authorizes a prospective permit or license applicant to request the issuing Federal agency to enter into early consultation with the Service on a proposed action to determine whether such action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat. Section 7(a)(4) of the Act requires Federal agencies to confer with the Secretary on any action that is likely to jeopardize the continued existence of proposed species or result in the destruction or adverse modification of proposed critical habitat. Section 7(b) of the Act requires the Secretary, after the conclusion of early or formal consultation, to issue a written statement setting forth the Secretary's opinion detailing how the agency action affects listed



species or critical habitat Biological assessments are required under section 7(c) of the Act if listed species or critical habitat may be present in the area affected by any major construction activity as defined in §404.02. Section 7(d) of the Act prohibits Federal agencies and applicants from making any irreversible or irretrievable commitment of resources which has the effect of foreclosing the formulation or implementation of reasonable and prudent alternatives which would avoid jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat. Section 7(e)– (o)(1) of the Act provide procedures for granting exemptions from the requirements of section 7(a)(2). Regulations governing the submission of exemption applications are found at 50 CFR part 451, and regulations governing the exemption process are found at 50 CFR parts 450, 452, and 453.

### §402.02   Definitions.
…
*Action* means all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies in the United States, <u>in foreign nations,</u> or upon the high seas.
Examples include, but are not limited to:
(a) actions intended to conserve listed species or their habitat;
(b) the promulgation of regulations;
(c) the granting of licenses, contracts, leases, easements, rights-of way, permits, or grants-in-aid; or
(d) actions directly or indirectly causing modifications to the land, water, or air<u>, or climate.</u>

*Action area* means all areas to be affected directly or indirectly by the Federal action, <u>including spatially distant or remote areas,</u> and not merely the immediate area involved in the action.
…
<u>*Adverse modification* means any direct or indirect alteration that results in non-de minimis impacts to the value of a critical habitat unit for the survival or recovery of a listed species. Such alterations include, but are not limited to, alterations to the enumerated physical or biological features that were the basis for determining the habitat to be critical.</u>
…
<u>*Destruction* means a direct or indirect alteration that permanently decreases the extent of critical habitat available for the survival or recovery of a listed species.</u>
…
~~*Destruction or adverse modification* means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species.~~
…
*Effects of the action* ~~are all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action. A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action. (See §402.17).~~ <u>refers to the direct,</u> ~~and~~ <u>indirect, and cumulative effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline. Indirect effects are those that are caused by the proposed action and are later in time or spatially distant or remote, but still are</u>


CENTER *for* BIOLOGICAL DIVERSITY

reasonably foreseeable to occur. Interrelated actions are those that are part of a larger action and depend on the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration.

*Endangered Species.* Any species which is in danger of extinction throughout all or a significant portion of its range other than a species of the Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this chapter would present an overwhelming and overriding risk to humans. A species can be considered endangered even if it is not currently on the brink of extinction or at risk of extinction globally.

*Environmental baseline* refers to the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. Environmental baseline does not include any completed federal actions that have not undergone consultation. ~~Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.~~
…

*Line biologist(s)* refers to the primary biologist(s) responsible for preparing a biological opinion or habitat conservation plan and conducting research or collecting data on any plant or animal species.
…

*Recovery* means improvement in the status of listed species ~~to the point at which listing is no longer appropriate under the criteria set out in section 4(a)(1) of the Act.~~ such that:

(1) the species is of sufficient abundance, measured by numbers of individuals, numbers of populations, range extent, and habitat availability, that it possesses the necessary representation, redundancy, and resiliency to ensure the species' long-term persistence, and to ensure that the species continues to perform its ecological role in each significant portion of its range; and

(2) the species is no longer at risk of becoming endangered within the foreseeable future in any significant portion of its range due to (A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence.
…

*Threatened species.* Any species which is likely to become endangered within the foreseeable



CENTER *for* BIOLOGICAL DIVERSITY

future throughout all or a significant portion of its range. A species can be considered threatened even if its population trend is currently stable.

## § 402.03. Applicability.

…

(b) All Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this Act by establishing and carrying out programs for the conservation of any such endangered species and threatened species listed pursuant to section 4 of this Act where such agency in causing take of such species or expects to cause take of such species as a result of normal agency actions functions.

## § 402.04. Counterpart regulations.

The consultation procedures set forth in this part may be superseded for a particular Federal agency by joint counterpart regulations among that agency, the Fish and Wildlife Service, and the National Marine Fisheries Service, provided that such counterpart regulations have undergone consultation pursuant to section 7(a)(2) of the Act and the completion of an Environmental Impact Statement pursuant to the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq*. No counterpart regulations shall take effect prior to the completion of all legally required consultations and other compliance requirements. Such counterpart regulations shall be published in the FEDERAL REGISTER in proposed form and shall be subject to public comment for at least 60 days before final rules are published.

## § 402.13. Informal consultation.

…

(c) *Initiation of formal consultation.* (1) A written request to initiate formal consultation shall be submitted to the Director and shall include:

(i) A description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action. Consistent with the nature and scope of the proposed action, the description shall provide sufficient detail to assess the effects of the action on listed species and critical habitat, including:

(A) The purpose of the action;

(B) The duration and timing of the action;

(C) The location of the action;

(D) The specific components of the action and how they will be carried out;

(E) Maps, drawings, blueprints, or similar schematics of the action; and

(F) Any other available information related to the nature and scope of the proposed action relevant to its effects on listed species or designated critical habitat.

(ii) A map or description of all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (*i.e.,* the action area as defined at §402.02).

(iii) Information obtained by or in the possession of the Federal agency and any applicant on the listed species and designated critical habitat in the action area (as required by paragraph (c)(1)(ii) of this section), including available information such as the presence, abundance, density, or periodic occurrence of listed species and the condition and location of the species' habitat,

CENTER *for* BIOLOGICAL DIVERSITY

~~including any critical habitat.~~
~~(iv) A description of the effects of the action and an analysis of any cumulative effects.~~
~~(v) A summary of any relevant information provided by the applicant, if available.~~
~~(vi) Any other relevant available information on the effects of the proposed action on listed species or designated critical habitat, including any relevant reports such as environmental impact statements and environmental assessments.~~
~~(2) A Federal agency may submit existing documents prepared for the proposed action such as NEPA analyses or other reports in substitution for the initiation package outlined in this paragraph (c). However, any such substitution shall be accompanied by a written summary specifying the location of the information that satisfies the elements above in the submitted document(s).~~
~~(3) Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with §402.12.~~
~~(4) Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan. The provision in this paragraph (c)(4) does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole.~~
<u>(i) A description of the action to be considered;</u>
<u>(ii) A description of the specific area that may be affected by the action;</u>
<u>(iii) A description of any listed species or critical habitat that may be affected by the action;</u>
<u>(iv) A description of the manner in which the action may affect any listed species or critical habitat and an analysis of any cumulative effects;</u>
<u>(v) Relevant reports, including any environmental impact statement, environmental assessment, or biological assessment prepared; and</u>
<u>(vi) Any other relevant available information on the action, the affected listed species, or critical habitat. Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with §402.12. Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area or a segment of a comprehensive plan. This does not relieve the Federal agency of the requirements for considering the effects of the action as a whole.</u>
…
(g) *Service responsibilities.* Service responsibilities during formal consultation are as follows:
…
~~(4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.~~
<u>(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.</u>
…
(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data

 CENTER *for* BIOLOGICAL DIVERSITY

available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. ~~Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.~~

(h) *Biological opinions.*
…
<u>(3) (A) The line biologist shall be primarily responsible for making scientific recommendations pursuant to this section regarding whether a Federal agency action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat, as well as the conditions for issuing a permit for incidental take if warranted.</u>

<u>(B) If the line biologist's scientific conclusions are changed or altered by a supervising biologist, political official, or other Department of the Interior or Department of Commerce employee, each change or alteration must be documented and posted to the federal docket, and shall include: (1) the name of the employee; (2) their qualifications and expertise regarding the specific species at issue; and (3) the scientific justification or information that supports such change to the line biologist's original conclusion.</u>

~~(3) The Service may adopt all or part of:~~
~~(i) A Federal agency's initiation package; or~~
~~(ii) The Service's analysis required to issue a permit under section 10(a) of the Act in its biological opinion.~~
~~(4) A Federal agency and the Service may agree to follow an optional collaborative process that would further the ability of the Service to adopt the information and analysis provided by the Federal agency during consultation in the development of the Service's biological opinion to improve efficiency in the consultation process and reduce duplicative efforts. The Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat, and other relevant factors to determine whether an action or a class of actions is appropriate for this process. The Federal agency and the Service may develop coordination procedures that would facilitate adoption of the initiation package with any necessary supplementary analyses and incidental take statement to be added by the Service, if appropriate, as the Service's biological opinion in fulfillment of section 7(b) of the Act.~~
…
~~(l) *Expedited consultations.* Expedited consultation is an optional formal consultation process that a Federal agency and the Service may enter into upon mutual agreement. To determine whether an action or a class of actions is appropriate for this type of consultation, the Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat and other relevant factors. Conservation actions whose primary purpose is to have beneficial effects on listed species will likely be considered appropriate for expedited consultation.~~
~~(1) *Expedited timelines.* Upon agreement to use this expedited consultation process, the Federal agency and the Service shall establish the expedited timelines for the completion of this~~

CENTER *for* BIOLOGICAL DIVERSITY

~~consultation process.~~
~~(2) *Federal agency responsibilities.* To request initiation of expedited consultation, the Federal agency shall provide all the information required to initiate consultation under paragraph (c) of this section. To maximize efficiency and ensure that it develops the appropriate level of information, the Federal agency is encouraged to develop its initiation package in coordination with the Service.~~
~~(3) *Service responsibilities.* In addition to the Service's responsibilities under the provisions of this section, the Service will:~~
~~(i) Provide relevant species information to the Federal agency and guidance to assist the Federal agency in completing its effects analysis in the initiation package; and~~
~~(ii) Conclude the consultation and issue a biological opinion within the agreed-upon timeframes.~~

(i) *Incidental take.*
…
(7) No Federal agency triggering consultation under this section for a threatened or endangered species shall receive an incidental take statement unless that agency has in place a section 7(a)(1) conservation program for that threatened or endangered species.

### § 402.15. Responsibilities of Federal agency following issuance of a biological opinion.

(a) Following the issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its section 7 obligations and the Service's biological opinion.
(b) If a jeopardy biological opinion is issued, the Federal agency shall notify the Service of its final decision on the action.
(c) If the Federal agency does not adopt one of the Service's proposed reasonable and prudent alternatives for any reason, and no comparable alternative is implemented, then the Service shall not issue an incidental take statement to the Federal agency.
~~(e)~~ (d) If the Federal agency determines that it cannot comply with the requirements of section 7(a)(2) after consultation with the Service, it may apply for an exemption. Procedures for exemption applications by Federal agencies and others are found in 50 CFR part 451.

~~§ 402.17. Other Provisions~~
~~(a) *Activities that are reasonably certain to occur.* A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Factors to consider when evaluating whether activities caused by the proposed action (but not part of the proposed action) or activities reviewed under cumulative effects are reasonably certain to occur include, but are not limited to:~~
~~(1) Past experiences with activities that have resulted from actions that are similar in scope, nature, and magnitude to the proposed action;~~
~~(2) Existing plans for the activity; and~~
~~(3) Any remaining economic, administrative, and legal requirements necessary for the activity to go forward.~~
~~(b) *Consequences caused by the proposed action.* To be considered an effect of a proposed action, a consequence must be caused by the proposed action (*i.e.,* the consequence would not~~

 CENTER *for* BIOLOGICAL DIVERSITY

~~occur but for the proposed action and is reasonably certain to occur). A conclusion of reasonably certain to occur must be based on clear and substantial information, using the best scientific and commercial data available. Considerations for determining that a consequence to the species or critical habitat is not caused by the proposed action include, but are not limited to:~~
~~(1) The consequence is so remote in time from the action under consultation that it is not reasonably certain to occur; or~~
~~(2) The consequence is so geographically remote from the immediate area involved in the action that it is not reasonably certain to occur; or~~
~~(3) The consequence is only reached through a lengthy causal chain that involves so many steps as to make the consequence not reasonably certain to occur.~~
~~(c) *Required consideration.* The provisions in paragraphs (a) and (b) of this section must be considered by the action agency and the Services.~~
~~[84 FR 45018, Aug. 27, 2019]~~

## E.  Permits for Incidental Taking of Species

§ 17.22 Permits for scientific purposes, enhancement of propagation or survival, or for incidental taking.

(b)(1) Application requirements for permits for incidental taking.

…

(2) Issuance criteria.

(i) Upon receiving an application completed in accordance with paragraph (b)(1) of this section, the Director will decide whether or not a permit should be issued. The Director shall consider the general issuance criteria in § 13.21(b) of this subchapter, except for § 13.21(b)(4), and shall issue the permit if he or she finds that:

(A) The taking will be incidental;

(B) The applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such takings;

<u>(C) The plan confers a net benefit on species sought to be covered by the permit;</u>

(<u>D</u>) The applicant will ensure that adequate funding for the conservation plan and procedures to deal with unforeseen circumstances will be provided;

(<u>E</u>) The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild;

(<u>F</u>) The measures, if any, required under paragraph (b)(1)(iii)(D) of this section will be met; and



CENTER *for* BIOLOGICAL DIVERSITY

(G) He or she has received such other assurances as he or she may require that the plan will be implemented.

**(3) Permit conditions.** In addition to the general conditions set forth in part 13 of this subchapter, every permit issued under this paragraph shall contain such terms and conditions as the Director deems necessary or appropriate to carry out the purposes of the permit and the conservation plan. <u>Such terms and conditions shall include mandatory self-reporting by the permittee for each occurrence of incidental take of a covered species, as well as any additional</u> monitoring and reporting requirements deemed necessary for determining whether such terms and conditions are being complied with. The Director shall rely upon existing reporting requirements to the maximum extent practicable.

…

~~**(5) Assurances provided to permittee in case of changed or unforeseen circumstances**. The assurances in this paragraph (b)(5) apply only to incidental take permits issued in accordance with paragraph (b)(2) of this section where the conservation plan is being properly implemented, and apply only with respect to species adequately covered by the conservation plan. These assurances cannot be provided to Federal agencies. This rule does not apply to incidental take permits issued prior to March 25, 1998. The assurances provided in incidental take permits issued prior to March 25, 1998 remain in effect, and those permits will not be revised as a result of this rulemaking.~~

~~(i) Changed circumstances provided for in the plan. If additional conservation and mitigation measures are deemed necessary to respond to changed circumstances and were provided for in the plan's operating conservation program, the permittee will implement the measures specified in the plan.~~

~~(ii) Changed circumstances not provided for in the plan. If additional conservation and mitigation measures are deemed necessary to respond to changed circumstances and such measures were not provided for in the plan's operating conservation program, the Director will not require any conservation and mitigation measures in addition to those provided for in the plan without the consent of the permittee, provided the plan is being properly implemented.~~

~~(iii) Unforeseen circumstances.~~

~~(A) In negotiating unforeseen circumstances, the Director will not require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan without the consent of the permittee.~~

~~(B) If additional conservation and mitigation measures are deemed necessary to respond to~~



CENTER *for* BIOLOGICAL DIVERSITY

~~unforeseen circumstances, the Director may require additional measures of the permittee where the conservation plan is being properly implemented, but only if such measures are limited to modifications within conserved habitat areas, if any, or to the conservation plan's operating conservation program for the affected species, and maintain the original terms of the conservation plan to the maximum extent possible. Additional conservation and mitigation measures will not involve the commitment of additional land, water or financial compensation or additional restrictions on the use of land, water, or other natural resources otherwise available for development or use under the original terms of the conservation plan without the consent of the permittee.~~

~~(C) The Director will have the burden of demonstrating that unforeseen circumstances exist, using the best scientific and commercial data available. These findings must be clearly documented and based upon reliable technical information regarding the status and habitat requirements of the affected species. The Director will consider, but not be limited to, the following factors:~~

~~(1) Size of the current range of the affected species;~~

~~(2) Percentage of range adversely affected by the conservation plan;~~

~~(3) Percentage of range conserved by the conservation plan;~~

~~(4) Ecological significance of that portion of the range affected by the conservation plan;~~

~~(5) Level of knowledge about the affected species and the degree of specificity of the species' conservation program under the conservation plan; and~~

~~(6) Whether failure to adopt additional conservation measures would appreciably reduce the likelihood of survival and recovery of the affected species in the wild.~~

**(5) Changed or unforeseen circumstances.**

If additional conservation and mitigation measures are deemed necessary to respond to changed or unforeseen circumstances, the Director may require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan.

…

(8) Criteria for revocation. ~~A permit issued under paragraph (b) of this section may not be revoked for any reason except those set forth in § 13.28(a)(1) through (4) of this subchapter or unless continuation of the permitted activity would be inconsistent with the criterion set forth in~~

CENTER *for* BIOLOGICAL DIVERSITY

~~16 U.S.C. 1539(a)(2)(B)(iv) and the inconsistency has not been remedied.~~ <u>The Director shall revoke a permit issued under this paragraph if he or she finds that the permittee is not complying with the terms and conditions of the permit.</u>

<u>§ 222.307 Permits for incidental taking of species</u>

…

(c) ***Issuance criteria.***

   …

(2) To issue the permit, the Assistant Administrator must find that -

(i) The taking will be incidental;

(ii) The applicant will, to the maximum extent practicable, monitor, minimize, and mitigate the impacts of such taking;

<u>(iii) The plan confers a net benefit on species sought to be covered by the permit</u>

(<u>iv</u>) The taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild;

(<u>v</u>) The applicant has amended the conservation plan to include any measures (not originally proposed by the applicant) that the Assistant Administrator determines are necessary or appropriate; and

(<u>vi</u>) There are adequate assurances that the conservation plan will be funded and implemented, including any measures required by the Assistant Administrator.

(d) ***Permit conditions.*** In addition to the general conditions set forth in this part, every permit issued under this section will contain such terms and conditions as the Assistant Administrator deems necessary and appropriate, including, but not limited to the following:

(1) Reporting requirements or rights of inspection for determining whether the terms and conditions are being complied with;

(2) The species and number of animals covered;

(3) The authorized method of taking;

<u>(4) Mandatory self-reporting by the permittee for each occurrence of incidental take of a covered species;</u>

44


CENTER *for* BIOLOGICAL DIVERSITY

(5) The procedures to be used to handle or dispose of any animals taken; and

(6) The payment of an adequate fee to the National Marine Fisheries Service to process the application.

…

   …

(g) ~~*Assurances provided to permittee in case of changed or unforeseen circumstances.*~~ ~~The assurances in this paragraph (g) apply only to incidental take permits issued in accordance with paragraph (c) of this section where the conservation plan is being properly implemented, and apply only with respect to species adequately covered by the conservation plan. These assurances cannot be provided to Federal agencies. This rule does not apply to incidental take permits issued prior to March 25, 1998. The assurances provided in incidental take permits issued prior to March 25, 1998, remain in effect, and those permits will not be revised as a result of this rulemaking.~~

~~(1) *Changed circumstances provided for in the plan.* If additional conservation and mitigation measures are deemed necessary to respond to changed circumstances and were provided for in the plan's operating conservation program, the permittee will implement the measures specified in the plan.~~

~~(2) *Changed circumstances not provided for in the plan.* If additional conservation and mitigation measures are deemed necessary to respond to changed circumstances and such measures were not provided for in the plan's operating conservation program, NMFS will not require any conservation and mitigation measures in addition to those provided for in the plan without the consent of the permittee, provided the plan is being properly implemented.~~

~~(3) *Unforeseen circumstances.*~~

~~(i) In negotiating unforeseen circumstances, NMFS will not require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan without the consent of the permittee.~~

~~(ii) If additional conservation and mitigation measures are deemed necessary to respond to unforeseen circumstances, NMFS may require additional measures of the permittee where the conservation plan is being properly implemented. However, such additional measures are limited to modifications within any conserved habitat areas or to the conservation plan's operating conservation program for the affected species. The original terms of the conservation plan will be maintained to the maximum extent possible. Additional conservation and mitigation measures will not involve the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources otherwise available for development or use under the original terms~~



CENTER *for* BIOLOGICAL DIVERSITY

~~of the conservation plan without the consent of the permittee.~~

~~(iii) NMFS has the burden of demonstrating that unforeseen circumstances exist, using the best scientific and commercial data available. These findings must be clearly documented and based upon reliable technical information regarding the status and habitat requirements of the affected species. NMFS will consider, but not be limited to, the following factors:~~

~~(A) Size of the current range of the affected species;~~

~~(B) Percentage of range adversely affected by the conservation plan;~~

~~(C) Percentage of range conserved by the conservation plan;~~

~~(D) Ecological significance of that portion of the range affected by the conservation plan;~~

~~(E) Level of knowledge about the affected species and the degree of specificity of the species' conservation program under the conservation plan; and~~

~~(F) Whether failure to adopt additional conservation measures would appreciably reduce the likelihood of survival and recovery of the affected species in the wild.~~

**(g) Changed or unforeseen circumstances.**

If additional conservation and mitigation measures are deemed necessary to respond to changed or unforeseen circumstances, NMFS may require the commitment of additional land, water, or financial compensation or additional restrictions on the use of land, water, or other natural resources beyond the level otherwise agreed upon for the species covered by the conservation plan.

…(i) Criteria for revocation. The Director shall revoke a permit issued under this paragraph if he or she finds that the permittee is not complying with the terms and conditions of the permit.

**F.      U.S. Fish and Wildlife Service Enhancement Permits**

**§ 17.3. Definitions**

*Enhance the propagation or survival* means the activity sought to be permitted itself improves or increases the propagation or survival of the species. When used in reference to wildlife in captivity, includes but is not limited to the following activities when it can be shown that such activities would not be detrimental to the survival of wild or captive populations of the affected species:…

**§ 17.22. Permits for scientific purposes, enhancement of propagation or survival, or for**


CENTER *for* BIOLOGICAL DIVERSITY

incidental taking.
…
(a)(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a)(1) of this section, the Director will decide whether or not a permit should be issued. In making this decision, the Director shall consider, in addition to the general criteria in §13.21(b) of this subchapter, the following factors:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit <u>or otherwise improves or increases the propagation or survival of the species;</u>

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

<u>In making this decision, the activity being permitted must itself improve or increase the propagation or survival of the species. Generation of fees, payments, or monetary contributions cannot justify an enhancement finding.</u>

## § 17.32 Permits—general.

Upon receipt of a complete application the Director may issue a permit for any activity otherwise prohibited with regard to threatened wildlife. Such permit shall be governed by the provisions of this section unless a special rule applicable to the wildlife, appearing in §§17.40 to 17.48, of this part provides otherwise. Permits issued under this section must be for one of the following purposes: Scientific purposes, or the enhancement of propagation or survival, or economic hardship, or zoological exhibition, or educational purposes, or incidental taking, or special purposes consistent with the purposes of the Act. Such permits may authorize a single transaction, a series of transactions, or a number of activities over a specific period of time. <u>The Director shall publish notice in the FEDERAL REGISTER of each application for a permit that is made under this section. Each notice shall invite the submission from interested parties, within 30 days after the date of the notice, of written data, views, or arguments with respect to the application. The 30-day period may be waived by the Director in an emergency situation where the life or health of an endangered animal is threatened and no reasonable alternative is available to the applicant. Notice of any such waiver shall be published in the FEDERAL REGISTER within 10 days following issuance of the permit.</u>
…
(a)(2) Issuance criteria. Upon receiving an application completed in accordance with paragraph (a)(1) of this section, the Director will decide whether or not a permit should be issued. In



making this decision, the Director shall consider, in addition to the general criteria in §13.21(b) of this subchapter, the following factors:

(i) Whether the purpose for which the permit is required is adequate to justify removing from the wild or otherwise changing the status of the wildlife sought to be covered by the permit;

(ii) The probable direct and indirect effect which issuing the permit would have on the wild populations of the wildlife sought to be covered by the permit;

(iii) Whether the permit, if issued, would in any way, directly or indirectly, conflict with any known program intended to enhance the survival probabilities of the population from which the wildlife sought to be covered by the permit was or would be removed;

(iv) Whether the purpose for which the permit is required would be likely to reduce the threat of extinction facing the species of wildlife sought to be covered by the permit;

(v) The opinions or views of scientists or other persons or organizations having expertise concerning the wildlife or other matters germane to the application; and

(vi) Whether the expertise, facilities, or other resources available to the applicant appear adequate to successfully accomplish the objectives stated in the application.

<u>In making this decision, the activity being permitted must itself improve or increase the propagation or survival of the species. Generation of fees, payments, or monetary contributions cannot justify an enhancement finding.</u>

### G.    Strengthening the Regulations Governing Experimental Populations and Reintroduction of Threatened and Endangered Species

### § 17.81. Listing

(a) The Secretary may designate as an experimental population a population of endangered or threatened species that has been or will be released into suitable ~~natural~~ habitat outside the species' current ~~natural~~ range ~~(but within its probable historic range, absent a finding by the Director in the extreme case that the primary habitat of the species has been unsuitably and irreversibly altered or destroyed)~~, subject to the further conditions specified in this section; *provided,* that all designations of experimental populations must proceed by regulation adopted in accordance with 5 U.S.C. 553 and the requirements of this subpart.

…

(c) Any regulation promulgated under paragraph (a) of this section shall provide:

…

(3) Management restrictions, protective measures, or other special management concerns of that population~~, which may include but are not limited to, measures to isolate and/or contain the experimental population designated in the regulation from natural populations; and~~

…

(d) The Fish and Wildlife Service shall consult with appropriate State fish and wildlife agencies, local governmental entities, affected Federal agencies, and affected private landowners in developing and implementing experimental population rules. When appropriate, a public meeting will be conducted with interested members of the public. ~~Any regulation promulgated pursuant to this section shall, to the maximum extent practicable, represent an agreement between the Fish and Wildlife Service, the affected State and Federal agencies and persons holding any interest in~~



land which may be affected by the establishment of an experimental population.